278

The State, ex rel. Keating, Appellee, *v.* A Motion Picture Film Entitled "Vixen" et al., Appellants.

(No. 70-554—Decided July 21, 1971.)

*Messrs. Keating, Muething & Klekamp* and *Mr. James J. Clancy,* for appellee.

*Messrs. Mesh & Moskowitz* and *Mr. Elmer Gertz,* for appellants,

*Per Curiam.* Although the production, exhibition and distribution of motion pictures is a large-scale business conducted for private profit, the fact that motion pictures are a medium for the expression of ideas accords them the safeguard of the First and Fourteenth Amendments. *Kingsley International Pictures Corp.* v. *Regents of University of the State of New York* (1959), 360 U. S. 684, 3 L. Ed. 2d 1512, 79 S. Ct. 1362. The United States Constitution, however, does not ordain absolute freedom for anyone to exhibit any motion picture of any kind at any time or place. *Dennis* v. *United States* (1951), 341 U. S. 494, 95 L. Ed. 1137, 71 S. Ct. 857; *Beauharnais* v. *Illinois* (1951), 343 U. S. 250, 96 L. Ed. 919, 72 S. Ct. 725; *Joseph Burstyn, Inc.,* v. *Wilson* (1952), 343 U. S. 495, 96 L. Ed. 1098, 72 S. Ct. 777. Thus, the exploitation, through the medium of a motion picture, of purported acts of sexual intercourse *solely* for the profit of the producer and exhibitors cannot constitute the communication of an idea or thought protected by the First and Fourteenth Amendments. *Chaplinsky* v. *New Hampshire* (1942), 315 U. S. 568, 86 L. Ed. 1031, 62 S. Ct. 766.

Having viewed the film and scrutinized the record containing reference to the circumstances surrounding the film, we view its production, dissemination and exhibition against a background of commercial exploitation for the sake of prurient appeal.

Defendant's exhibit 23, an article from the U. C. L. A. Daily Bruin, Friday, July 11, 1969, by Stanley Berkowitz, quotes Eve Meyer, the executive producer of "Vixen," as saying: "We're only in it for the money." This demonstrates the failure of the producers to conceal their attempt to exploit the film on grounds other than the communication of thought.

Further evidence supporting the act of commercial exploitation is shown by the number of cities, theaters and states in which the movie has been exhibited. Through February 16, 1970, "Vixen" has played in 673 cities, 46 states, 929 theaters and 1,010 playdates. At this time, no profit

figure has been made available. However, with $4,000,000 having already been received and an additional $4,000,000 in accounts receivable, the picture, as of February 16, 1970, has grossed $8,000,000.

Defendant's exhibit 18 reveals that:

"Meyer budgets his films at around $70,000. His other films, for example, 'The Immoral Mr. Teas' (1959) has now grossed $1,200,000 on a $26,500 investment. That's a 40-1 return . . . second in film history only to 'Gone With the Wind.' Meyer's subsequent films have done nearly as well. Both 'Lorna' (1963) and 'Eve and the Handyman' (1961) have grossed nearly a million, and not one of his 20 films have failed to return four times its original cost."

There is no reason to assume that "Vixen" will fail to reap the same harvest.

". . . [If evidence as to the] . . . production, sale, and publicity . . . [with respect to the book have been available, such circumstances would have been] . . . relevant in determining whether or not its publication and distribution was constitutionally protected . . . [on the grounds that evidence] that the book was commercially exploited for the sake of prurient appeal to the exclusion of all other values, might justify the conclusion that the book was utterly without redeeming social importance.

"It is not that in such a setting [commercial exploitation] the social value test is relaxed so as to dispense with the requirements that a book be utterly devoid of social value, but rather . . . where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, a court could accept his evaluation at its face value." *A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Attorney General of Massachusetts* (1966), 383 U. S. 413, 16 L. Ed. 2d 1, 86 S. Ct. 975.

In describing "Vixen," we rely on the expertise of various movie critics, whose literary efforts are contained in the record, for their depiction of the characters and events.

The principal character, Vixen, is a buxom young wife, whose "square" husband is a combination pilot and

fishing guide in the wilderness of British Columbia. His work keeps him away from their home for extended periods of time. Among the other characters are Vixen's motorcycle hood brother, a Canadian Mountie, with whom Vixen passes the first few minutes of the film, a vacationing couple who are guest-clients of the husband, a black American whom Vixen despises and who has fled the country to avoid the draft, and an Irish communist who attempts at gun-point to force Vixen's husband to fly him to Cuba. The first four are objects of Vixen's lechery.

The movie is approximately 70 minutes long, out of which approximately one-half deals with incest, adultery, and lesbianism, which are graphically portrayed through facial and bodily expressions indicative of orgasmic reaction. The remaining one-half of the movie leads the viewer through such contemporary issues as racism, anti-militarism, communism and airplane hijacking. It should be noted that, although the players are frequently shown nude and at full length, at no place are their genital parts exposed to the leering lens of the camera.

In ascertaining the true character of the film, we pierce the veil of contrived social commentary totally unrelated to the dominant theme of the picture. A similar approach was employed in *United States* v. *Rebhuhn* (1940), 109 F. 2d 512. Judge Learned Hand stated, at page 514, that: "The defendants had indiscriminately flooded the mails with advertisements, plainly designed to merely catch the prurient, though under the *guise* of distributing works of scientific or literary merit. . . . The circulars were no more than appeals to the salaciously disposed, and no [fact finder] could have failed to pierce the fragile screen, set up to cover that purpose." In *Murdock* v. *Pennsylvania* (1943), 319 U. S. 105, 87 L. Ed. 1292, 63 S. Ct. 870, 146 A. L. R. 81, as cited in footnote 17 of *Ginzburg* v. *United States* (1965), 383 U. S. 463, 16 L. Ed. 2d 31, 86 S. Ct. 942, the Supreme Court noted that "material sold solely to produce sexual arousal, . . . does not escape regulation because it has been dressed upon as speech. . . ."

"Vixen" presents to the viewer filmed behavior apart

from the advocacy of an idea or program. If picketing may include conduct other than speech, which conduct is subject to restrictive legislation (*Giboney* v. *Empire Storage & Ice Co.* [1949], 336 U. S. 490, 93 L. Ed. 834, 69 S. Ct. 684), so may a motion picture presentation. Mr. Justice Douglas, dissenting in *Roth* v. *United States* (1957), 354 U. S. 476 at 512, 1 L. Ed. 2d 1498, 77 S. Ct. 1304, 1323, stated: "No one would suggest that the First Amendment permits nudity in public places, adultery, and other phases of sexual misconduct." Thus, if sexual intercourse on public view is offensively shocking and destructive of public morals, purported sexual intercourse on the screen likewise is subject to legislative regulation.

Whether sexual intercourse is committed in a public place or simulated on the screen, conduct, not free speech, is the controlling issue. "Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it." (Douglas, dissenting in *Roth* v. *United States, supra* [354 U. S. 476, 514].)

*Trans-Lux Distributing Corp.* v. *Board of Regents of University of the State of New York* (1964), 14 N. Y. 2d 88, 198 N. E. 2d 242 (reversed on other grounds, 380 U. S. 259, 13 L. Ed. 2d 959, 85 S. Ct. 952), was a proceeding to review the determination of the state Board of Regents' refusal to license a motion picture. This decision speaks to the issue of speech versus conduct in films. In reversing, the Supreme Court merely referred to *Freedman* v. *Maryland* (1965), 380 U. S. 51, 13 L. Ed. 2d 649, 85 S. Ct. 734, wherein a Maryland statute was held invalid because of its failure to provide adequate procedural safeguards against undue inhibition of protected expression. Hence, the Supreme Court did not reach the substantive issue of speech versus conduct as applied to films by the New York Court of Appeals.

At page 863 in its opinion in *Trans-Lux*, the New York Court of Appeals stated: " . . . because the material assigned as obscene . . . is not . . . speech as opposed to con-

duct, it need not come within the test laid down in *Roth* v. *United States, supra* (354 U. S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304), that, in speech cases, obscenity must be the dominant theme of the work as a whole. If that requirement were applicable to cases of this nature, the law would be helpless to cope with the grossest imaginable pornography if it were included in a film as an incidental feature, collateral to the main plot, just as a *profitable* bit of sensationalism.''

Assume, hypothetically, that the main character in ''The Sound of Music'' performs, during one scene, an act of sexual lewdness, could we permit that part of the film to go unregulated merely because the producer had an ''eye on the recent Supreme Court rulings?''[1] The question supplies its own answer.

Neither the First Amendment of the United States Constitution nor the Ohio Constitution will be construed as inhibiting the General Assembly from proscribing the commercial exploitation of a purported act of sexual intercourse.

Since the real issue before this court is whether the injunction should be dissolved, or continued in force and effect, R. C. 2905.34[2] and 2905.35[3] are applicable at this

---

[1] Defendant's exhibit 17, a film review from the Chicago Sun Times, Monday, February 24, 1969 by Roger Ebert states, "Meyer is also heavy on the redeeming social value department, no doubt with an eye on the recent Supreme Court rulings that make 'Vixen' possible."

[2] R. C. 2905.34:

"As used in Sections 2903.13 to 2903.16, inclusive, and Sections 2905.34 to 2905.39, inclusive, of the Revised Code:

"(A) Any material or performance is 'obscene' if, when considered as a whole and judged with reference to ordinary adults, any of the following apply:

"(1) Its dominant appeal is to prurient interest;

"(2) Its dominant tendency is to arouse lust by displaying or depicting nudity, sexual excitement, or sexual conduct in a way which tends to represent human beings as mere objects of sexual appetite;

"(3) Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;

"(4) It contains a series of displays or descriptions of nudity,

time notwithstanding their enactment postdates the injunction granted below.

Those two sections, now the law of Ohio, when construed together and applied to the instant facts, effective-

sexual excitement, sexual conduct, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient interest, when the appeal to such interest is primarily for its own sake or for commercial exploitation, rather than for a genuine scientific, educational, sociological, moral, or artistic purpose.

"(B) 'Nudity' means the showing, representation, or depiction of human male or female genitals, pubic area, or buttocks with less than a full, opaque covering, or of a female breast with less than a full, opaque covering or any portion thereof below the top of the nipple, or of covered male genitals in a discernibly turgid state.

"(C) 'Sexual excitement' means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

"(D) 'Sexual conduct' means masturbation, homosexuality, lesbianism, sadism, masochism, natural or unnatural sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, a breast.

"(E) 'Material' means any book, pamphlet, ballad, printed paper, phonographic record or tape, motion picture film, print, picture, figure, image, description, or other tangible thing capable of being used to arouse interest through sight, sound, or in any other manner.

"(F) 'Performance' means any motion picture, preview, play, show, skit, dance, or other exhibition performed before an audience."

[8]R. C. 2905.35:

"No person, with knowledge of the content and character of the obscene material or performance involved, shall make, manufacture, write, draw, print, reproduce, or publish any obscene material, knowing or having reasonable cause to know that such material will be sold, distributed, circulated, or disseminated; or sell, lend, give away, distribute, circulate, disseminate, exhibit, or advertise any obscene material; or write, direct, produce, present, advertise, or participate in an obscene performance; or possess or have in his control any obscene material with intent to violate this section; or offer or agree to do any act in violation of this section, or cause any such act to be done by another.

"Whoever violates this section shall be fined not more than five thousand dollars or imprisoned not more than one year, or both, for a first offense, and for each subsequent offense shall be fined not more than ten thousand dollars or imprisoned not less than one nor more than seven years, or both."

ly provide that: "No person, with knowledge of the content and character of the . . . motion picture . . . involved, shall . . . present *such* motion picture . . . before an audience *which* contains a series of displays . . . of . . . sexual intercourse . . . the cumulative effect of which is a dominant tendency to appeal to prurient interest, when the appeal to such interest is . . . for commercial exploitation. . . ." (Italicized words supplied.) So stated, they proscribe conduct which "bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion." *Schneider* v. *State* (1939), 308 U. S. 147, 161, 84 L. Ed. 155, 60 S. Ct. 146, 150.

Doubt can no longer remain that the depiction of purported acts of sexual intercourse on the movie screen and the public exhibition thereof "for commercial exploitation rather than for a genuine, scientific, educational, sociological, moral, or artistic purpose" is forbidden by Ohio law. Here, there is no dispute as to the fact that "Vixen" does depict numerous acts of purported sexual intercourse, and obviously it does so for a commercial purpose. No useful purpose could be served by remanding the cause to a lower court for consideration of the impact of those two statutes. We have the authority to "render such judgment as . . . [the lower court] should have rendered." Paragraph two of the syllabus in *Peltz* v. *South Euclid* (1967), 11 Ohio St. 2d 128; and paragraph three of the syllabus in *Neil* v. *Neil* (1883), 38 Ohio St. 558.

It follows that we have authority to render such judgment as the lower court would now be required to render, if the cause were remanded. Such authority is specifically given in Section 2(B)(1)(f), Article IV, Ohio Constitution.

Therefore, where scenes in a motion picture film depict purported acts of sexual intercourse and are exhibited for commercial exploitation, those scenes are violative of R. C. 2905.34 and 2905.35, constitute a "nuisance" within the meaning of R. C. 3767.01, and their exhibition may be enjoined as provided in R. C. 3767.02 *et seq.*

Insofar as it upholds the injunction against the exhibition of those portions of "Vixen" which depict actual or purported acts of sexual intercourse, the judgment of the Court of Appeals is affirmed.

*Judgment accordingly.*

O'NEILL, C. J., SCHNEIDER, HERBERT, STERN and LEACH, JJ., concur.

DUNCAN and CORRIGAN, JJ., dissent.

SCHNEIDER, J., concurring. I would add that the scenes of "Vixen," which we have found are proscribed by the statute, are totally unrelated to the balance of the movie. If it should be argued that their purpose is to emphasize the message of the film—assuming it has one—my answer is simply that there are uncounted other ways to utter or to underscore an abstract idea. An act of simulated coition performed in the nude is one way, at least, which is not constitutionally protected under the circumstances presented by this case.

The prohibited scenes, however they may appeal incidentally to the sexually curious or voracious, may be worthy of protection in a controlled environment, but, as a part of "Vixen," they were not, nor are they proposed to be, exhibited for any claimed educational or scientific value.

DUNCAN, J., dissenting. My disagreement with the majority in this case is not complete, but I am unable to agree with the fashion in which R. C. 2905.34 and R. C. 2905.35 are held applicable.

Before discussing these Ohio statutes, I must first express my dissatisfaction with certain interpretations that the majority places on the constitutional law of the United States respecting this kind of case. As I read the opinion, it is first concluded that the "exploitation, through the medium of a motion picture, of purported acts of sexual intercourse solely for the profit of the producer and exhibi-

tors cannot constitute the communication of an idea or a thought protected by the First and Fourteenth Amendments.'' This emphasis on the profit motive catapults the importance of such evidence to a height never before reached, and as I read *Ginzburg* v. *United States* (1966), 383 U. S. 463, it was never intended to be given such determinative importance. In *Ginzburg*, the court held that ''pandering'' of materials could be considered by the courts in their determination of whether the materials were obscene. The pandering (*i. e.*, advertising, etc., with a heavy emphasis on the appeal to prurient interest), however, is only ''*relevant* in determining the ultimate question of obscenity,'' not determinative in and of itself. *Id.* at 470.[4] Admittedly, and rightly so, the pandering evidence is important but was never intended to replace the three-part test established in *Roth* v. *United States* (1956), 354 U. S. 476. That test was particularly described in *Memoirs* v. *Massachusetts* (1966), 383 U. S. 413, at 418, as to whether, ''the dominant theme of the material, taken as a whole, appeals to a prurient interest in sex;'' whether the material is ''ut-

---

[4] The opinion of the Supreme Court in *Ginzburg* stated:

"This evidence [of advertising], in our view, was relevant in determining the ultimate question of obscenity and, in the context of this record, serves to resolve all ambiguity and doubt. The deliberate representation of petitioners' publications as erotically arousing, for example, stimulated the reader to accept them as prurient; he looks for titillation, not for saving intellectual content. Similarly, such representation would tend to force public confrontation with the potentially offensive aspects of the work; the brazeness of such an appeal heightens the offensiveness of the publications to those who are offended by such material. And the circumstances of presentation and dissemination of material are equally relevant to determining whether social importance claimed for material in the courtroom was, in the circumstances, pretense or reality —whether it was the basis upon which it was traded in the marketplace or a spurious claim for litigation purposes. Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity. Certainly in a prosecution which, as here, does not necessarily imply suppression of the materials involved, the fact that they originate or are used as a subject of pandering is relevant to the application of the *Roth* test." (383 U. S., at 470.)

terly without redeeming social value;" and whether "the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters."

The majority opinion cites Mr. Justice Douglas, dissenting in *Roth* v. *United States* (1956), 354 U. S. 476, at 512, wherein he states: "No one would suggest that the First Amendment permits nudity in public places, adultery and other phases of sexual misconduct." This principle appears to be so clear that it is almost redundant. However, the conclusion reached by the majority does not necessarily follow from that cited language. The majority then states: "Thus where the actual conduct is offensively shocking and destructive of public morals, an act of simulated sexual intercourse on film is subject to the same regulation as the original." It must be kept in mind that the majority in *Roth* did not announce such a principle as definitive of obscenity. Obviously, certain conduct projected on a motion picture screen can be obscene. But the decision is not reached so easily as to base the determination on what human acts are protected by the First Amendment. The majority appears to conclude that acts depicted in a motion picture are "conduct" and, as such, not protected as expression. Both reason, and the weight of authority hold otherwise. I think it clear that "motion pictures are within the ambit of the constitutional guarantees of freedom of speech and of the press." *Jacobellis* v. *Ohio* (1964), 378 U. S. 184, 187. For this reason I also disagree with the trial court's determination regarding the film's affronting contemporary community standards by reference to the fact that the conduct depicted would violate criminal statutes if humans were actually engaged in such acts in public. It seems to me both reason and the weight of authority dictate that the conclusion of the majority, as well as that of the trial court, in this respect is not correct. Daily in modern living the communications media bring to our senses all sorts of verbal or pictorial descriptions of acts which, if performed by live human beings, would

be subjected to criminal sanctions. Is it the rule of law that the performance of criminal acts cannot be portrayed in the movies or on television? Such is not the law.

Turning now to the real basis of my opposition to the result reached in the instant case, this action was commenced as a nuisance abatement action under R. C. 3767.-01 *et seq.*, on relation of the state of Ohio. The rationale of this court's decision leads us to recently enacted statutes, R. C. 2905.34 and 2905.35, all effective September 15, 1970, after both the Court of Common Pleas and the Court of Appeals had rendered their judgments. Rather than using the test of obscenity established in *Roth* v. *United States, supra*,[5] the determination of this matter on appeal was made with reference to and the application of the above-cited Ohio statutes. R. C. 2905.37 reads, in part:

"(A) Where it appears that Section 2903.14 or 2905.-35 of the Revised Code is being or is about to be violated, the county prosecutor or chief executive or legal officer of a municipal corporation in the jurisdiction where such violation is taking place or is about to take place, may maintain an action in the Common Pleas Court to enjoin the sale, distribution, or presentation of the obscene material or performance, or enjoin the sale, distribution, or presentation to minors under eighteen of the material or performance harmful to minors.

"(B) The defendant is entitled to trial on the merits within five days after joinder of the issues, and the court

---

[5] In the case *A Book* v. *Attorney General* (1966), 383 U. S. 413, at page 418, the court stated:

"We defined obscenity in *Roth* in the following terms: '[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interests.' 354 U. S. at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

shall render its decision within not more than five days after conclusion of the trial. If the court finds that such material or performance is obscene, it shall enjoin the sale, distribution, or presentation of such material or performance, if the court finds that such material or performance is harmful to minors, it shall enjoin the sale distribution, or presentation of such material or performance to minors under eighteen.''

This lawsuit was not brought by the county prosecutor or chief executive or a legal officer of a municipal corporation. Moreover, the defendant did not receive the benefit of a trial, as required by the statute.

If, for the purpose of deciding what is obscene as that word is used in R. C. 3767.01 *et seq.*, this court is looking to the definitions provided in R. C. 2905.34 to determine the rights of the parties in this appeal, then I believe this procedure gives retroactive application to the statute and is thus violative of the Ohio Constitution. The litigants and the courts below could not have been expected to advocate their legal positions in terms of statutes not yet in existence. If we are to review the rights of the parties under a recently enacted statute, due process of law demands at a minimum that the litigants have their day in court concerning these newly enacted statutes. Obviously the heart of this case, whether the action is to be determined under the *Roth* test or under the newly enacted Ohio standards, is a matter of constitutional determination. I am mindful that there are many instances when appellate courts have exercised their prerogative to use as a basis of determination certain standards not briefed or argued by counsel, and in a proper case in the interest of judicial efficiency that should be done. But, the newness of the statutes (R. C. 2905.34 and 2905.35), and the fact that this is a case of a such great importance, dictates that this should not be done to insure these parties full due process of law.

I conclude by cautioning that none of this is to be taken as expressing this writer's approval of the subject

matter of this lawsuit; nor is it intended to express anything but my most profound displeasure with it. However, we must make a determination with regard to obscenity in this case—when, in the words of Justice Black, "I can imagine no task for which this court of * * * judges is less equipped to deal." *United States* v. *Thirty-Seven Photographs* (1971), 39 L. W. 4518, 4526.

We should determine this lawsuit only after providing the parties an opportunity to consider, argue, and brief the constitutional questions resulting from the application of the facts in this case to the newly enacted statutes. This is no more than reliance upon the mechanics of a judicial process which has served us well.

Therefore, at this time I am not able to agree with the basis of the decision expressed by the majority. I would reverse on a limited basis, leaving the injunction in effect until final determination, and remand the cause to the Court of Common Pleas so that the parties may have an opportunity to fully litigate the constitutionality and applicability of the current standard for determining this cause under the definitions of R. C. 2905.34.

CORRIGAN, J., dissenting. I find myself in disagreement with the conclusion of the majority, that the film "Vixen" is in fact obscene matter, under the tests established by the Supreme Court of the United States.

As a court we are bound by the definition of obscenity delineated in *Roth* v. *United States* (1957), 354 U. S. 476, 489, and that standard is "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."

That court later in *Jacobellis* v. *Ohio* (1964), 378 U. S. 184, 191, set out in the majority opinion that: "The question of the proper standard for making this determination has been the subject of much discussion and controversy since our decision in *Roth* seven years ago. Recognizing that the test for obscenity enunciated there—'whether to the

average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest,' 354 U. S. at 489—is not perfect, we think any substitute would raise equally difficult problems, and we therefore adhere to that standard. We would reiterate, however, our recognition in *Roth* that obscenity is excluded from the constitutional protection only because it is 'utterly without redeeming social importance,' and that 'the portrayal of sex, *e. g.*, in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press.' *Id.* at 484, 487. It follows that material dealing with sex in a manner that advocates ideas, *Kingsley International Pictures Corp.* v. *Regents of University of the State of New York* (1959), 360 U. S. 684, or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection. Nor may the constitutional status of the material be made to turn on a 'weighing' of its social importance against its prurient appeal, for a work cannot be proscribed unless it is 'utterly' without social importance * * *.''

"Under the *Roth* definition, as elaborated in subsequent cases, *three elements must coalesce*: It must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is *utterly* without redeeming social value.'' *A Book* v. *Attorney General* (1966), 383 U. S. 413, 418. (Emphasis added.) Further on in the latter case Justice Brennan gave emphasis to the third criterion of the test as follows:

''* * * A book cannot be proscribed unless it is found to be *utterly* without redeeming social value.'' 383 U. S. 419. Utterly, of course, means completely, absolutely, entirely.

In my view, the film in question is not ''*utterly* with-

out redeeming social value." At least half of the running time of the film is devoted to activity other than sex. Some of the material provides much more than mere transitional continuity between the sexual episodes. In fact, there is portrayal of racial problems in relation to the companion of Vixen's brother; to draft evasion by the evader taking residence in Canada; and to communism versus our system of government as a way of life. It must be noted, too, that some would conclude that this material deals with sex in a manner that advances ideas. Also, some viewers could with justification consider the film as having some artistic value.

Although I can agree that the producer did intend to exploit sex for the sake of money and that the dominant theme of the film is sex, it does not follow from this, as demonstrated from the citations above, that it is therefore obscene.

In my opinion the film, taken as a whole, at least contains sufficient commentary on matters of some social importance to bring it within the ambit of the protection of the First and Fourteenth Amendments. For the reasons stated, I am constrained to dissent.