Victor **GORDON**, Plaintiff,

v.

Gordon B. **CHRISTENSON**, Salt Lake County Attorney, Defendant.

John C. **CHANONAT** aka Jean-Claude Chanonat, Plaintiff,

v.

Gordon B. **CHRISTENSON**, Salt Lake County Attorney, Defendant.

Nos. C–87–70, C–88–70.

United States District Court,
D. Utah,
Central Division.

Sept. 15, 1970.

Gerald H. Kinghorn, Salt Lake City, Utah, for plaintiffs.

Curtis K. Oberhansly, Salt Lake City, Utah, for defendant.

Robert B. Hansen, Deputy Atty. Gen., amicus curiae.

Before LEWIS, Chief Judge, and CHRISTENSEN and BOHANON, District Judges.

## MEMORANDUM DECISION AND ORDER

LEWIS, Chief Judge.

■ Each of the plaintiffs in this action has been arrested and is presently charged with violations of sections 76–39–5(5) and 76–39–11, Utah Code Annotated (Supp.1969) commonly referred to as the Utah obscenity statutes.[1] Local authorities have voluntarily held the prosecutions in abeyance pending determination by this court of plaintiffs' claimed right to federal injunctive and declaratory relief through contention that the subject statutes are patently unconstitutional as violative of the first amendment as applied to the states by the fourteenth amendment. Plaintiffs also contend that their prosecutions have been undertaken by the local officials in bad faith and thus should be enjoined as impairing specific and general first amendment rights. And, finally, plaintiffs contend that the subject statutes are being unconstitutionally applied as to them and that this court should so declare. We conclude that this court has jurisdiction under plaintiffs' complaint containing the stated allegations pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. §§ 1981, 1983 and that the action is one calling for a three-judge court which has accordingly been properly convened. 28 U.S.C. § 2281.

■■ We have no hesitancy in rejecting plaintiffs' contention that the subject statutes are inherently unconstitutional.

---

1. Utah Code Ann. § 76–39–5 provides: It shall be unlawful for any person to willfully or knowingly * * *. (5) Sing or speak an obscene or lewd song, ballad or any other obscene or lewd words in any public place or in the presence of other persons.

Utah Code Ann. § 76–39–11 provides: "*Obscene*" *defined.*—Whenever it appears in this act, the word "obscene" shall have the following meaning: whether to the average person, applying contemporary community standards, the dominant theme of the material or the conduct taken as a whole appeals to the prurient interest. The judge or the jury shall be the sole trier of what is obscene. Prurient interest shall mean a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters and is a matter which is utterly without redeeming social importance.

In this regard plaintiffs contend that the Utah obscenity statute is impermissibly vague and overbroad in its definition of the term "obscene" and therefore unconstitutional on its face. The statutory definition contained in Utah Code Ann. § 76–39–11, with its emphasis on contemporary community standards, prurient interest, and redeeming social importance, is an obvious attempt to adopt the obscenity standard established by the Supreme Court in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498.[2] Since the Utah statute does not conform exactly with the present tripartite test as enunciated in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1,[3] the issue is whether a criminal obscenity statute must expressly incorporate all Supreme Court decisions defining obscenity in order to be valid. We hold that it need not. All that is required is that a statute give adequate notice and warning of what conduct is prohibited. The Utah statute accomplishes this since it contains the essential ingredients of the present constitutional standard for obscenity as reflected in judicial interpretations pertaining to creative art.

■ Other than giving notice, the inclusion of any definition of the word "obscene" within the statute is unnecessary. The constitutional definition as enunciated by *Memoirs* and other decisions is automatically and impliedly included within the Utah statute by way of the Supremacy Clause of the United States Constitution and the binding effect of Supreme Court decisions interpreting that Constitution. It is reasonable to assume that the Utah courts will recognize this supremacy and hold or instruct a jury in any prosecution under the statute according to the obscenity test enunciated in *Memoirs*. Similar conclusions have been reached in respect to other state statutes. *See, e. g.*, Hosey v. City of Jackson, D.C., 309 F.Supp. 527; Delta Book Distributors, Inc. v. Cronvich, D. C., 304 F.Supp. 662; Great Speckled Bird of Atlanta Coop. News Project v. Stynchcombe, D.C., 298 F.Supp. 1291.

The contentions that plaintiffs are being prosecuted in bad faith and under an unconstitutional application of the specific obscenity statutes are somewhat interrelated and require at least a narrative summary of plaintiffs' conduct which forms the basis for prosecution. On April 15, 1970, Students for a Democratic Society sponsored a political rally, which was held in the main ballroom of the Union Building located on the campus of the University of Utah in Salt Lake City. The meeting was open to the public and was attended by interested persons including students, university officials, and representatives of the Salt Lake County Attorney's office. Both plaintiffs spoke at the meeting. Mr. Chanonat, the first to speak, described to the audience the importance of the "new left" and, in so doing, used a number of gutter-type words to describe or express his extreme criticism of government authorities in Washington and other elected representatives. Following Mr. Chanonat's speech, Mr. Gordon read some poetry and gave a rather straightforward speech absent any objectionable words. At the end of the speech, however, Mr. Gordon told the audience there was a certain word, referred to as "M–F.," which he understood could not be said in our society. He invited the audience to say the word along with him, and

---

2. "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U.S. at 489, 77 S.Ct. at 1311.

3. "[T]hree elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." 383 U.S. at 418, 86 S.Ct. at 977.

at the count of three, numerous people joined Mr. Gordon in shouting the word.

On the same day that the S.D.S. meeting was held the Attorney General of Utah issued an official opinion directing subordinates to the effect that certain words (some of which were used by plaintiffs) were obscene within the context of the Utah statutes and their use by speakers at the University could premise a prosecution under the statutes. Also on that same date, Mr. Henr_, Nygaard, an attorney for the University of Utah who had listened to the subject speeches and who is the complaining witness in the prosecutions, proceeded to the County Attorney's office and strongly urged the issuance of complaints against the plaintiffs. A lengthy discussion between Mr. Nygaard and the prosecuting authorities was had during which the deputy attorneys expressed professional doubt as to whether plaintiffs could be successfully prosecuted under the obvious limitations of the statutes and also whether even a successful prosecution would be in the public interest at that particular time. Comment was made to the effect that the Attorney General's opinion had not then been publicized and that a prosecution might incite many students who, although totally unsympathetic to plaintiffs' choice of words, might think it necessary in principle to defend a belief in plaintiffs' right to indulge in the dramatics of vulgarity as an instrument of social protest.

■ Against this evidentiary background we have no difficulty in rejecting plaintiffs' second contention—that the pending prosecutions were conceived in bad faith. No bad-faith prosecution of the *Dombrowski*[4] type has been demonstrated in the instant case. As noted in Sheridan v. Garrison, 5 Cir., 415 F.2d 699, 709, *Dombrowski* and its progeny require that certain criteria must be satisfied before plaintiffs are entitled to relief: "(1) a bad-faith use of the state's legal machinery with the purpose of inhibiting the exercise of the right of free speech (or, alternatively, the existence of a statute unconstitutional on its face affecting free speech) and (2) a probability of irreparable injury, which is established if there is a showing of a significant chilling effect on speech that cannot be avoided by state court adjudication." The plaintiffs must show essentially that the prosecuting authorities brought charges "with no expectation of convictions but only to discourage exercise of protected rights." Cameron v. Johnson, 390 U.S. 611, 621, 88 S.Ct. 1335, 1341, 20 L.Ed.2d 182. This is a heavy burden. *See* Sheridan v. Garrison, *supra*, 415 F. 2d at 710. The most that this record reveals is an original professional and practical hesitancy upon the part of the County Attorney before exercising the discretion entrusted by law to that position.

■ There remains the significant question as to whether the Utah statutes, although constitutional in their inception and not shown to be here subjectively utilized by the prosecuting authorities in bad faith, are nevertheless being unconstitutionally applied to these plaintiffs. As we have indicated, we do not consider the Utah laws to be overbroad; to the contrary, the Utah legislature by statutory definition of the word "obscene" would seem to have placed very clear limitations upon the term. Our question then is not whether the state legislature *could* prohibitively recognize that words "that might properly be employed in a term paper about *Lady Chatterley's Lover* or in a novel submitted in a creative writing course take on a very different coloration if they are bellowed over a loudspeaker at a campus rally or appear prominently on a sign posted on a campus tree." Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027, 1058 (1969). Our inquiry is limited by the exacting words of the statutes and we are not impressed with defendant's position that the instant prosecutions fall clearly within the compulsion of those statutes. People v. Price, 4 Cal.App.3d 941, 84 Cal.Rptr. 585, is clearly distin-

4. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22.

**150**

guishable and not persuasive to us. However, federal courts will not interfere with a state's administration of its criminal laws absent compelling circumstances, and the pending state actions against plaintiffs are not shown to have had any restrictive effect upon the potential first amendment rights of plaintiffs or others. The mere potential of an unconstitutional application of a valid statute does not dictate irreparable injury and does not justify the granting of either injunctive or declaratory relief on this issue by this court.

This memorandum will serve as the findings of fact and conclusions of law of the court and it is ordered, adjudged and decreed that these actions be, and they hereby are severally dismissed.