320 So.2d 668

**GENERAL CORPORATION, a corporation,**

v.

**STATE of Alabama ex rel. Eugene SWEE-TON, Chief of Police, City of Huntsville, Alabama.**

**SC 521.**

Supreme Court of Alabama.

Sept. 18, 1975.

---

Frierson M. Graves, Jr., Memphis, Tenn., for appellant.

Watts, Salmon, Roberts, Manning & Noojin, Huntsville, for appellee.

ALMON, Justice.*

The question presented by this appeal is whether the Alabama Red Light Abatement Act, Tit. 7, § 1091 et seq., Code of Alabama 1940, Recompiled 1958, can be constitutionally applied to the exhibition of obscene motion pictures. More specifically, whether the showing of obscene motion pictures constitutes a public nuisance, the sanction for which is the padlocking of the premises for up to one year.

The complaint filed January 16, 1973, alleged that for a period in excess of nineteen months, appellant had consistently shown obscene films at the Fox Cinema Theatre and that the showing of certain of these films constituted a violation of both the nuisance and obscenity laws of the State of Alabama. The complaint prayed for issuance of a preliminary injunction after notice and hearing, and that after a final hearing on the issue of obscenity, appellant, General Corporation, be perpetually enjoined from maintaining said nuisance.

The pretrial order, issued on February 13, 1973, set out the contentions of the respective parties including a stipulation that the Fox Cinema Theatre was an enclosed adult movie house. A supplemental pretrial order was issued on February 22, 1973, stipulating that the issues in controversy were, whether the conduct of appellant constituted "lewdness" under Tit. 7, § 1091, Code, supra.

On February 23, 1973, the final decree of the trial court was entered. Specifically, the trial judge found that appellant had engaged in showing obscene movies at the

---

* This case was originally assigned to a justice formerly on this court. It has been reassigned to the writer who has listened to the tape recordings of the oral argument.

Fox Cinema Theatre and that such activity constituted a public nuisance. Pursuant to that finding, the court decreed that appellant be perpetually enjoined from maintaining said nuisance at the Fox Cinema Theatre or elsewhere in the county; that all personal property contained in the theatre be removed and sold in the manner provided for the sale of chattels under execution; that the theatre be closed for all purposes for one year unless sooner released under the provisions of Tit. 7, § 1104, Code, supra; and that the proceeds of the sale be applied to the costs. A writ of injunction was issued embodying the terms of the final decree.

On March 23, 1973, the court amended its final decree specifically limiting its operation to obscene matter, but leaving undisturbed the provision closing the theatre for one year.

The evidence showed that appellant was engaged in the operation for profit of the Fox Cinema Theatre, situated in Huntsville, Alabama. During the period of December 20, 1972, through January 10, 1973, inclusive, Mr. Ron Curlee, a detective employed by the Huntsville Police Department, visited the Fox Cinema Theatre on several occasions. During these visits Mr. Curlee took numerous sequential photographs and recorded contemporaneous audio tapes of the films which were being exhibited at the theatre. These motion picture films were entitled: "The Making of the Blue Movie," "I am Sandra," "Mary Jane," "The Gun Runners," "The Executive Wives," and "The Mermaids." At trial Mr. Curlee, referring to the notes and pictures he had taken while at the theatre, testified as to the subject matter content of each of the foregoing films. That testimony tended to show that said films depicted, *inter alia,* sexual intercourse, fellatio, cunnilingus, group sex, lesbianism, auto-eroticism, fettishism, voyeurism, and sado masochistic sexual activities.

The State's contention below was that the movies exhibited at the Fox constituted a public nuisance in that they were "ob-

scene," and that under the provisions of Tit. 7, § 1091, et seq. (the Alabama Red Light Abatement Act) the operation of the theatre was subject to abatement. Appellant's position was that this Act was not intended to apply to motion picture films or, in the alternative, if the legislature did so intend, such application is unconstitutional.

Any doubts that patently obscene expression falls outside the protection of the First Amendment and therefore enjoys no immunity from state regulations have long been laid to rest. *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *United States v. Reidel,* 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). "The primary requirements of decency may be enforced against obscene publications." *Near v. State of Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). More recently the United States Supreme Court has reaffirmed the principle that the states have a legitimate interest in regulating the use of obscene material; and, more specifically, that local regulations dealing with such material will not be disturbed or struck down so long as they comport with specific constitutional mandates. *Paris Adult Theatre v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973).

However, due to the elevated status ascribed to First Amendment guarantees, procedures adopted by states for dealing with obscene expression have been the subject of close judicial scrutiny. *Marcus v. Property Search Warrant,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). The line between expression unconditionally guaranteed and that which may be legitimately regulated is finely drawn. *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

Although motion pictures are a form of expression and within the shield of the First Amendment, *United States v. A Motion Picture Film,* 404 F.2d 196 (2d

Cir. 1968), they are not necessarily subject to the same rules governing other modes of expression. *Burstyn v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1951). Because of the singularly unique nature of the medium, a motion picture may be denominated obscene and thereby exceed the protective bounds of the First Amendment long before a written description of the same subject matter. *Landau v. Fording,* 245 Cal.App.2d 820, 54 Cal.Rptr. 177, aff'd 388 U.S. 456, 87 S.Ct. 2109, 18 L.Ed.2d 1317 (1966); *People v. Bloss,* 18 Mich. App. 410, 171 N.W.2d 455 (1969). Moreover, the United States Supreme Court has expressly rejected constitutional immunity from state regulation for obscene films simply because their exhibition is limited to consenting adults. *Paris Adult Theatre v. Slaton,* supra.

■ So, although the regulation of obscene expression is unquestionably a legitimate matter for state control, it does not necessarily follow that the doctrine of public nuisance can be constitutionally applied to obscenity. Traditionally, continuing activity contrary to public morals or decency have constituted public nuisances. *Price v. State,* 96 Ala. 1, 11 So. 128 (1891); *Ridge v. State,* 206 Ala. 349, 89 So. 742 (1921); *Hayden v. Tucker,* 37 Mo. 214 (1866); *Federal Amusement Co. v. State, ex rel. Tuppen,* 159 Fla. 495, 32 So. 2d 1 (1947); *Abbott v. State,* 163 Tenn. 384, 43 S.W.2d 211 (1931); Perkins on Criminal Law, p. 395 (Foundation Press, 1969); Wood, Law of Nuisances, § 68, p. 87, vol. 1 (3d ed., 1893); 66 C.J.S. Nuisance § 18 d, p. 766. Under the police power, a court of equity with proper legislative authorization can assume jurisdiction to abate a nuisance notwithstanding the fact that the maintenance of that nuisance may also be a violation of the criminal law. *Ridge v. State,* supra.; *Evans Theatre Corporation v. Slaton,* 227 Ga. 377, 180 S.E.2d 712 (1971), cert. denied 404 U.S. 950, 92 S.Ct. 281, 30 L.Ed.2d 267 (1971).

However, where First Amendment rights are involved, there was been no such una-nimity of authority for a multitude of reasons, the more salient of which warrant separate consideration.

■ At the outset we note three requirements imposed by the First Amendment upon *any* statute which attempts to regulate obscene material: (1) the burden of proving obscenity must always rest with the State; (2) administrative action determining matter to be obscene must not have an air of finality—there must be provision for prompt judicial review; (3) where prior restraint exists, there must be an immediate final determination on the issue of obscenity. *Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); *United Artists Corporation v. Wright,* 368 F. Supp. 1034 (N.D.Ala.1974); *Gulf States Theatres of Louisiana v. Richardson,* 287 So.2d 480 (La.Sup.Ct.1974); *New Rivieria Arts Theatre v. State,* 412 S.W.2d 890 (Tenn.Sup.Ct.1967).

■ In terms of burden of proof, traditional public nuisance doctrine vis-a-vis obscenity poses a twofold dilemma; (1) what is the burden of proof, and (2) upon whom does the burden fall. Regarding the former, there is a dichotomy in the social ills against which obscenity law and public nuisance law are directed. The definitional test for obscenity attempts to separate those materials protected by the guaranties of freedom of expression; the aim of a nuisance action, on the other hand, is not the suppression of a particular form of expression, rather the abatement of a condition which works harm upon a substantial number of the public or which injuriously affects public safety, health, or morals. *City of Selma v. Jones,* 202 Ala. 82, 79 So. 476 (1918).

In *Grove Press, Inc. v. City of Philadelphia,* 418 F.2d 82 (3d Cir. 1969) it was held that nuisance doctrine was too elastic and amorphous to constitutionally restrict First Amendment rights. The court concluded that public nuisance doctrine could not be used both to define the standards of protected speech and to serve as a vehicle

for its restraint. Accord, *State ex rel. Murphy v. Morley,* 63 N.M. 267, 317 P.2d 317 (1957); *Commonwealth v. Guild Theatre, Inc.,* 432 Pa. 378, 248 A.2d 45 (1968).

Tit. 7, § 1091, Code, supra, defines as a nuisance any place where ". . . *lewdness,* assignation, or prostitution is conducted, permitted, continued, or exists; . . ." (Emphasis ours). By contrast, this language is discernibly "amorphous" when compared with Tit. 14, § 374(16j) (1971 Supp.) which defines obscenity and related terms with specificity and incorporates the three-prong test for "hard-core pornography" of *Roth v. United States,* supra. The final decree of the trial court, however, demonstrates that in finding the films "obscene", the trial judge used the Roth Standard incorporated in the above statute.

■ Since the final decree in this cause, the U. S. Supreme Court decided *Miller,* supra. We consider under the facts of this case that the *Roth* test embodied in our statute was more stringent than the subsequent *Miller* doctrine. Therefore, appellant can hardly complain that the *Miller* standards have worked to its detriment. Moreover, we are here dealing with a civil remedial statute with ample due process safeguards and since we are in the civil realm we need not be quite so conscious of the strictures attendant in criminal prosecution. We believe that the reasoning in *Pierce v. State,* 292 Ala. 473, 296 So.2d 218 (1974), applies with equal force here; specifically, that definitional infirmities in the Alabama Red Light Abatement Act were cured by judicial construction. Accord, *State ex rel. Ewing v. "Without a Stitch",* 37 Ohio St.2d 95, 307 N.E.2d 911 (1974); *Gordon v. Christenson,* 317 F.Supp. 146 (D.Utah 1970); *Grove Press Inc. v. Evans,* 306 F.Supp. 1084 (E.D.Va. 1969).

Appellant argues in the alternative that notwithstanding curative judicial construction, the legislature did not intend the Alabama Red Light Abatement Act to be applicable. There is a substantial amount of persuasive authority for this proposition from judicial interpretation in sister states of their respective Red Light Abatement Acts strikingly comparable to our own. In *People v. Goldman,* 7 Ill.App.3d 253, 287 N.E.2d 177 (1972), it was held that, as used in its statute, "lewdness" was a synonym for prostitution and therefore the Act did not apply to the activity there sought to be enjoined (a "pornoshop"). Similarly, in *Gulf States Theatres of Louisiana v. Richardson,* supra, the Louisiana Supreme Court reasoned that its public nuisance statute passed in 1918, only one year prior to our own, was originally designed to control prostitution and gambling and therefore could not be used in the First Amendment area. The court also emphasized the fact that the statute contained virtually no standards for making judicial determinations of obscenity. Accord, *Southland Theatre, Inc. v. State ex rel. Tucker,* 495 S.W.2d 148 (Ark.Sup.Ct. 1973); *Harmer v. Tonlyn Productions, Inc.,* 23 Cal.App.3d 941, 100 Cal.Rptr. 576 (1972).

■ However, from the broad language of Tit. 7, § 1091, Code, supra, there is no indication of any legislative intent to either include or exclude its application to obscene material. Controlling here is the fact that the Alabama Red Light Abatement Act has been construed as being merely declaratory of the common law, *Duncan v. City of Tuscaloosa,* 257 Ala. 574, 60 So.2d 438 (1952), and, as previously noted, acts at common law contrary to public morals were considered as public nuisances and subject to abatement as such.

■ The second aspect regarding burden of proof—which party upon whom the burden falls—is resolved in favor of the State. The Alabama Red Light Abatement Act contains none of the burden shifting evils present in *Near v. State of Minnesota,* supra, or *Freedman v. State of Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d

649 (1965). The transcript clearly shows that the prosecution was called upon and did in fact meet its burden of proof. Neither the Alabama Red Light Abatement Act nor the Alabama Law on Obscenity authorizes any pre-exhibition licensing or permit procedure. The transcript reveals that appellant was not restrained from exhibiting the allegedly obscene films until after a final adversary proceeding on the issue.

██ The next requirement—prompt judicial review of any administrative or executive suppression—is also due to be resolved in favor of the State. As noted, the Act does not allow nor was there in fact any suppression of appellant's activities until after final adjudication on the issue of obscenity. Although the Act does make provision for issuance of a temporary injunction after the filing of the original complaint, Tit. 7, § 1095, Code, supra, a hearing thereon must be had within ten days, *ibid*. The provision for an ex parte restraining order, Tit. 7, § 1096, is expressly limited to "the moving or in any manner interfering with the personal property and contents of the place where such nuisance is alleged to exist . . . ." and imposes no restraint upon continuing exhibitions of films until trial on the merits.

Although not at issue here, the application of Tit. 7, § 1101, providing for the closing of the premises pending final determination, presents a more troublesome problem which could constitute a pre-adjudicatory suppression of exhibition.

In *Teitel Film Corporation v. Cusack*, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968), the United States Supreme Court struck down for want of prompt judicial review a city licensing ordinance which provided a 50 to 57 day administrative process before judicial review could be had. The *Teitel* decision, however, dealt with situations where administrative procedures in effect stayed the hand of the judiciary thereby preventing its prompt intervention, supervision, and final determina-

tion on the issue of obscenity. See also *Jodbar Cinema, Ltd. v. Sedita*, 309 F.Supp. 868 (W.D.N.Y.1970); *Freedman v. State of Maryland*, supra.

██ Under the Alabama Red Light Abatement Act, however, pre-adjudicatory restraint in the form of a temporary injunction is saved by other mandatory provisions in the Act which insure a speedy final resolution of the ultimate issue of obscenity. Tit. 7, § 1095, requires a hearing on that issue within ten days of the issuance of the temporary injunction; Tit. 7, § 1101, requires that the defendant must be given at least five days notice prior to the hearing on the matter of whether such an injunction will be granted; and Tit. 7, § 1103, requires that final adjudication shall take "precedence over all other cases except injunctions." Furthermore, the United States Supreme Court has held that the right to a speedy determination arises only where one has been ex parte deprived of a right. *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *Blount v. Rizzi*, supra. See also *Society to Oppose Pornography, Inc. v. Thevis*, 255 So.2d 876 (La. App.1972).

██ Turning to the last procedural requirement—constitutional prohibition against prior restraint of allegedly obscene expression without immediate judicial determination, any system for the regulation of obscene expression involving prior restraints comes to the court bearing a heavy presumption against its validity. *Bantam Books v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). The decree of the trial court included an order closing the Fox Theatre for *any* purpose for one year. This is not a liquor nuisance nor a prostitution nuisance; rather, a movie house charged with showing certain obscene motion pictures. Evidence of obscene conduct in the past does not justify enjoining future conduct which is protected by the First Amendment. *People ex rel. Hicks v. Sarong Gals*, 27 Cal.App.3d

46, 103 Cal.Rptr. 414 (1972). The padlocking of appellant's operation for one year constitutes prior restraint at its worst and is patently unconstitutional.

While the facts in the recent United States Supreme Court decision of *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), are not directly in point, the reasoning therein is particularly appropriate. We quote:

> ". . . The presumption against prior restraint is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable. See *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)."

We are not the first jurisdiction to hold unconstitutional as prior restraint of First Amendment guaranties the prospective abatement of movie houses as public nuisances. *Society to Oppose Pornography v. Thevis*, supra; *State of · Indiana ex rel. Blee v. Mohney Enterprises et al.*, Ind., 289 N.E.2d 519 (1972); *Gulf States Theatres of Louisiana, Inc. v. Richardson*, supra. The Alabama Law on Obscenity, Tit. 14, § 374(1) et seq., provides criminal penalties for conduct such as appellant's—if retributive punishment is sought, those sanctions, not abatement, are the only proper ones authorized by the legislature.

The provision in the Alabama Red Light Abatement Act, Tit. 7, § 1104, supra, allowing for the release on bond is not curative of this constitutional defect. See *Society to Oppose Pornography v. Thevis*, supra. This remedy is available only if the court is satisfied that the owner had no knowledge of the existence of the nuisance.

We are of the opinion there was ample evidence for the trial judge to conclude that the motion pictures in question are obscene. But we also hold that even if one is guilty of maintaining an obscenity nuisance, it is not constitutionally permissible to deprive him prospectively of his First Amendment rights.

Lest there be any confusion as to the extent of our holding that the Alabama Red Light Abatement Act cannot constitutionally be employed to enjoin prospectively the showing of films in enclosed movie theatres to an adult audience, we hasten to delimit this opinion to at least two First Amendment situations in which that statute so applied *might* pass constitutional muster.

The first would be where the impact of the injunction is absolutely devoid of prior restraint or chilling effect upon prospective exercises of expression other than that adjudicated as obscene. More specifically, where there has been a prompt adversary proceeding in which all the requisite constitutional standards for ascertaining the issue of obscenity have been met and the particular film has been found to be obscene; future exhibition of that *particular* film may well constitute a public nuisance and be permanently enjoined as such. See, *Evans Theatre Corporation v. Slaton*, supra; *Cactus Corporation v. State ex rel. Murphy*, 14 Ariz.App. 38, 480 P.2d 375 (1971); *State ex rel. Keating v. Vixen*, 27 Ohio St.2d 278, 272 N.E.2d 137 (1971); contra, *Harmes v. Tonlyn Productions, Inc.*, supra.

The second involves situations where there is a foisting off of patently obscene films, not fit for children to see, in places within their view to include public streets and facilities, residential properties, and private houses. Such activity may also

constitute a public nuisance subject to equitable injunction where, of course, attendant constitutional substantive and procedural safeguards are present. See *Bloss v. Paris Township*, 380 Mich. 466, 157 N.W.2d 260 (1968) (drive-in theatres exhibiting films not fit for minors in plain view of public streets and surrounding residences subject to abatement as a public nuisance). But see the recent case of *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

▇▇▇▇ The foregoing possible exceptions should not be construed by prosecuting authorities as a green light for prospective control of particular obscene films or drive-in theatres which broadcast such films. We again point up the imprecise nature of public nuisance doctrine which is ill-equipped to cope with the intricacies of First Amendment guaranties. The law of nuisance cannot become a vehicle for the protection of the sensibilities of the overly fastidious; nor can the doctrine of nuisance serve as a means of circumventing these First Amendment safeguards. The requirements of the First Amendment are stringent and demanding—any regulatory scheme which impinges upon these most precious rights will be assured of close scrutiny.

The judgment in this cause is due to be and hereby is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

MERRILL, FAULKNER and EMBRY, JJ., concur.

JONES, J., concurs in the result.

MADDOX, J., concurs specially.

HEFLIN, C. J., with whom BLOODWORTH and SHORES, JJ., join, concurs in the result, with opinion.

MADDOX, Justice (concurring specially).

I agree that the injunction issued here which prohibits the showing of *any* film for one year is overbroad, but I cannot agree that the trial judge is powerless to act.

The Fox Cinema Theatre had been used consistently to show films which depicted:

"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419.

Chief Justice Burger, writing for a majority of the court, in *Miller*, said that the states could regulate illegal conduct such as occurred in this case. One of the regulatory schemes which the Supreme Court, in *Miller*, said was permissible, includes: "applicable state law, as written *or authoritatively construed.*" *Miller* gave this Court the *power* to set the guidelines for regulation of works which depict or describe sexual conduct. It is my opinion, therefore, that a trial judge, using *Miller* standards, could enjoin the operation of a place as a public nuisance if the place had been used for the purpose of showing films which were obscene, under the *Miller* test. In view of the authority granted to this court under *Miller,* I do not think that this Court is so judicially weak, or should be so timid, that it cannot, or will not, "authoritatively construe" our redlight abatement law in such a manner that trial courts could regulate conduct which *Miller* specifically authorizes states to regulate.

Mr. Chief Justice Burger recognized in *Miller* that courts would not have an easy road, free from difficulty. He said:

" * * * But no amount of 'fatigue' should lead us to adopt a convenient 'in-

stitutional' rationale—an absolutist, 'anything goes' view of the First Amendment —because it will lighten our burdens. 'Such an abnegation of judicial supervision in this field would be inconsistent with our duty to uphold the constitutional guarantees.' *Jacobellis v. Ohio,* supra, 378 U.S. at 187–188, 84 S.Ct. [1676] at 1678 [12 L.Ed.2d 793] (opinion of Brennan, J.). Nor should we remedy 'tension between state and federal courts' by arbitrarily depriving the States of a power reserved to them under the Constitution, a power which they have enjoyed and exercised continuously from before the adoption of the First Amendment to this day. See *Roth v. United States,* supra, 354 U.S. at 482–485, 77 S.Ct. [1304], at 1307–1309 [1 L.Ed.2d 1498]. 'Our duty admits of no "substitute for facing up to the tough individual problems of constitutional judgment involved in every obscenity case." [Citations omitted.]' "

This Court is the highest court of this state. It is the highest court which can "authoritatively construe" our state laws. I think an examination of the *Miller* opinion clearly indicates that the Supreme Court of the United States intended state courts to construe their state statutes so as to incorporate the specifically prohibited conduct given as examples in the *Miller* case. I think that it is important that we keep in mind that the prohibited acts need not be specifically *written* in any applicable state law, but rather, a judicial construction may be obtained to authoritatively construe any statute so as to incorporate specifically prohibited acts.

It seems clear to me that state courts have the authority to authoritatively construe state statutes and that this is made imminently clear by an analysis of the *Miller* opinion. *Miller* was "vacated and remanded for further proceedings" rather than being outright reversed. I believe that if the Supreme Court was of the opinion that the California statute under consideration in *Miller* could not be authoritatively construed so as to incorporate the

new guidelines, the *Miller* case would have been reversed outright rather than being remanded for further proceedings.

The key to the Supreme Court's reasoning in this regard seems to be contained in footnote 7 of the case of *United States v. 12 200-Ft. Reels,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), handed down the same day as *Miller*. Footnote 7 in *United States v. 12 200-Ft. Reels,* reads as follows:

"We further note that, while we must leave to state courts the construction of state legislation, we do have a duty to authoritatively construe federal statutes where ' "a serious doubt of constitutionality is raised" ' and ' "a construction of the statute is fairly possible by which the question may be avoided." ' *United States x. Thirty-Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L. Ed.2d 822 (1971) (opinion of White, J.), quoting from *Crowell v. Benson,* 285 U. S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral' as used to describe regulated material in 19 U.S. C. § 1305(a) [19 U.S.C.S. § 1305(a)] and 18 U.S.C. § 1462 [18 U.S.C.S. § 1462], see *United States v. Orito,* supra, 413 U.S. at 140 n. 1, 93 S.Ct. [2674] at 2676 n. 1, [37 L.Ed.2d at 516] we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hardcore' sexual conduct given as examples in *Miller v. California,* supra, 413 U.S. at 25, 93 S.Ct. [2607] at 2615 [37 L.Ed.2d at 431]. See *United States v. Thirty-Seven Photographs,* supra, 402 U.S. at 369–374, 91 S.Ct. [1400], at 1404–1407 [28 L.Ed.2d 822] (opinion of White, J.). Of course, Congress could always define other specific 'hardcore' conduct."

It is significant that in the concluded portions of every opinion handed down concomitantly with *Miller*, the Supreme

Court cites to footnote *7* of *12 200-Ft. Reels* wherein the court construed the *federal* obscenity statutes as incorporating the specific representations and description of hard-core sexual conduct "given as examples in *Miller v. California, supra*."

The reason why the state court cases were remanded for further proceedings is also disclosed in footnote *7* of *12 200-Ft. Reels*. The court noted that while it had the power to authoritatively construe *federal statutes*, it did not possess the authority with reference to *state statutes*.

This is the reason why whenever any state court judgment (such as *Miller*) was vacated and remanded for further proceedings, the Supreme Court specifically referred the state court to footnote *7* of *United States v. 12 200-Ft. Reels*. I construe these judgments of the Supreme Court of the United States as actually inviting the state courts to authoritatively construe their own state statutes just as the federal statutes were construed by the Supreme Court itself in *12 200-Ft. Reels*.

It seemed clear to me that states are free to proceed with obscenity prosecutions under the new *Miller* standards, so long as the state courts construe and apply state obscenity statutes in a manner consistent with the new *Miller* guidelines.

The only constitutional problem I see in this case is the prior restraint inherent in the injunctive relief granted, but I believe relief could be tailored which would regulate illegal conduct, protect First Amendment rights, and would permit the operation of the business to show films which were not obscene. In short, the trial judge had voluminous evidence before him that the Fox Cinema Theatre was being used for an illegal activity. Faced with this overwhelming evidence of a pattern and practice of illegal conduct, and having determined the obscenity vel non of the films which were shown there, the trial court could have enjoined the further use of the theatre to show films which were "(a) Patently offensive representations or descrip-

tions of ultimate sexual acts, normal or perverted, actual or simulated; (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals."

Under *Miller*, I believe the trial judge, under authority of Alabama's Red Light Abatement Act could permanently enjoin the use of the theatre for showing *obscene* films and could require anyone desiring to use the theatre for a legitimate purpose to submit a plan which would show the purpose for which the theatre would be used and the trial court could determine promptly whether the proposed use was for a legitimate purpose, using the *Miller* standard, of course.

A California court, using a Red Light Abatement Act, permanently enjoined a tavern, its owner and operator and any other person from maintaining, using or occupying the premises for the purpose of "lewdness," closed the premises to *all* uses for one year except uses not involving entertainment, and ordered the sheriff to remove all fixtures, equipment and musical instruments from the tavern and to close the building for one year. *People ex rel. Hicks v. "Sarong Gals,"* 42 Cal.App.3d 556, 117 Cal.Rptr. 24 (1974).

The common law of public nuisance may be a valid method by which to implement the state's police power in cases such as this one. In *Grove Press Inc. v. City of Philadelphia*, 418 F.2d 82 (3 Cir., 1969), the court held that the court procedures chosen by the city there were improper, but the court spelled out how the city could regulate the showing of obscene films. It said:

"The mischief we perceive in the Pennsylvania equity rules is that there is no guarantee a final hearing will be seasonably scheduled after the issuance of a preliminary injunction and that a prompt decision will be forthcoming thereafter. The preliminary restraint could exist days, and even months, before the judicial decision on the merits; where this possibility exists,

an unacceptable threat to the freedom of expression without due process of law results. Failure to provide the necessary expeditiousness tinges the Pennsylvania preliminary injunctive procedures with unconstitutional hues when they are employed to restrain or inhibit expression prior to a final adjudication of an alleged obscene matter.

"We do not challenge, we reiterate, the postulate that 'the primary requirements of decency may be enforced against obscene publications.' *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 77 S.Ct. 1325, 1 L. Ed.2d 1469 (1957). This means that relief may be sought in both the civil and criminal branches of the Pennsylvania court system to enforce state laws on obscenity, consonant with the Due Process Clause of the Fourteenth Amendment and the guarantee of First Amendment expression. It is only when the right of the state to regulate obscenity collides with undue inhibition of protected expression that a problem of constitutional dimension arises. Where expression is inhibited as a result of prompt judicial decision reached after an adversary proceeding, there can be no procedural due process complaint. But where the inhibition occurs in a preliminary proceeding, with no guarantee of a prompt judicial decision on the merits, the procedure is constitutionally defective because a restraint of presumably protected expression not only occurs but is capable of persisting for an unlimited time prior to the required judicial determination.

"Our conclusion is not novel in Pennsylvania jurisprudence. The same basic determination has already been alluded to by Mr. Justice O'Brien, speaking for an evenly divided state Supreme Court in *Commonwealth v. Guild Theatre, Inc.,* 432 Pa. 378, 248 A.2d 45 (1968), where the validity of employing the Pennsylvania equity rules to enjoin obscene exhibitions was also raised. There, the state authorities had secured an ex parte injunction without affording the exhibitors any opportunity to be heard. In ruling such procedures con-

stitutionally defective, Mr. Justice O'Brien observed:

"'However, even if a proper hearing had been held, the instant proceeding was fatally defective in another respect. * * * Although we cannot agree with appellants' contention that no prior restraint on the exhibition of a motion picture is permissible, it is clear that any such restraint must be carefully circumscribed. In *Freedman v. State of Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965) the Supreme Court discussed the "procedural safeguards designed to obviate the dangers of a censorship system." One of these safeguards was a prompt, final judicial decision. * * * The fact that appellants may have been offered a full dress *hearing* within four days of the original restraint does not suffice. Quite clearly, there is no provision for a prompt *decision.* It is vital that the continuance of First Amendment freedoms not be dependent upon the efficiency of a particular judge but upon procedural safeguards clearly embodied in a statute. We can only suggest, as did the Court in *Freedman,* supra, that a model for such a statute which can safeguard both the First Amendment freedoms of exhibitors and publishers, and the freedom from obscenity of society as a whole can be found in *Kinglsey (sic) Books, Inc. v. Brown,* 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957). The New York statute there provided for a trial within one day after joinder of issue and a decision within two days of the conclusion of the trial. The instant procedure falls far short of that required.' 248 A.2d at 47–48."

The procedure I suggest, which would require the owner or operator to submit a plan setting out the future course of operation, would constitute some "prior restraint" and "chilling effect," if a prompt decision is made. I believe the test mentioned in *Grove Press* is met. While the protection against prior restraint is an important right, it is not an absolute one.

*Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1947).

Chief Justice Burger commented, in *Miller,* on the spectre of repression which the dissenting Justices feared. He wrote:

"The dissenting Justices sound the alarm of repression. But, in our view, to equate the free and robust exchange of ideas and political debate with commercial exploitation of obscene material demeans the grand conception of the First Amendment and its high purposes in the historic struggle for freedom. It is a 'misuse of the great guarantees of free spech and free press . . . .' *Breard v. Alexandria,* 341 U.S. at 645, 71 S.Ct. [920], at 934 [95 L.Ed. 1233, 35 ALR2d 335]. The First Amendment protects works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government of a majority of the people approve of the ideas these works represent. 'The protection given speech and press was fashioned to assure unfettered interchange of *ideas* for the bringing about of political and social changes desired by the people,' *Roth v. United States,* supra, 354 U.S. at 484, 77 S.Ct. [1304], at 1308 [1 L.Ed.2d 1498] (emphasis added). See *Kois v. Wisconsin,* 408 U.S. at 230–232, 92 S.Ct. [2245], at 2246–2247 [33 L.Ed.2d 312]; *Thornhill v. Alabama,* 310 U.S. at 101–102, 60 S. Ct. [736], at 743–744 [84 L.Ed. 1093]. But the public portrayal of hardcore sexual conduct for its own sake, and for the ensuing commercial gain, is a different matter.

"There is no evidence, empirical or historical, that the stern 19th century American censorship of public distribution and display of material relating to sex, see *Roth v. United States,* supra, 354 U.S. at 482–485, 77 S.Ct. [1304], at 1307–1309 [1 L.Ed.2d 1498], in any way limited or affected expression of serious literary, artistic, political, or scientific ideas. On the contrary, it is beyond any question that the era following Thomas Jefferson to Theodore Roosevelt was an 'extraordinarily vigorous period,' not just in economics and politics, but in belles lettres and in 'the outlying fields of social and political philosophies.'

"We do not see the harsh hand of censorship of ideas—good or bad, sound or unsound—and 'repression' of political liberty lurking in every state regulation of commercial exploitation of human interest in sex."

Consequently, I believe that the trial judge, although following state law, went too far in restraining the use of the theatre for legitimate purposes. This I do not think he could do, but I think he could ensure that if it was used, it would be for legitimate purposes, and not as it had been.

HEFLIN, Chief Justice (concurring in the result):

I concur in the result of the majority opinion in this cause but disagree with the language which attempts to cure the so-called definitional infirmities in the Alabama Red Light Abatement Act by judicial construction.

The majority opinion attempts to make the reasoning in *Pierce v. State,* 292 Ala. 473, 296 So.2d 218 (1974), applicable to the Alabama Red Light Abatement Act. In *Pierce,* this court engrafted by judicial construction the requirements of *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) to the 1961 Alabama Obscenity Statute to make it constitutional.

While *Miller v. California,* supra, substituted a less stringent prosecutorial requirement than the one developed from *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) and *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 974, 16 L.Ed.2d 1 (1966), in regard to literary, artistic, political or scientific values, it also addressed the issue of limiting specificity necessary for criminal obscenity statutes to withstand constitutional attacks on vagueness and overbreadth grounds.

The majority opinion states that the definitional infirmities in the Alabama Red

Light Abatement Act are cured by judicial construction. However, I cannot find in the majority opinion any language by which the requirements of *Miller* are added to the statute in question. I assume that the intent of the majority opinion is to engraft *Miller's* requirements of limiting specificity to the Alabama Red Light Abatement Act. Even if such language did appear in the majority opinion to accomplish such intent, I would, nevertheless maintain that the court does not have the right to judicially engraft these requirements of limiting specificity to the Alabama Red Light Abatement Act.

The following appears in *Miller:*

"This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment. *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972); *United States v. Reidel,* 402 U.S., at 354, 91 S. Ct. [1410], at 1411–1412; *Roth v. United States,* supra, 354 U.S. at 485, 77 S.Ct. [1304], at 1309 'The First and Fourteenth Amendments have never been treated as absolutes [footnote omitted]'. *Breard v. Alexandria,* 341 U.S. at 642, 71 S.Ct. [920], at 932, and cases cited. See *Times Film Corp. v. Chicago,* 365 U.S. 43, 47–50, 81 S.Ct. 391, 393–395, 5 L.Ed.2d 403 (1961); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S., at 502, 72 S.Ct. [777], at 780. We acknowledge, however, the inherent dangers of undertaking to regulate any form of expression. *State statutes designed to regulate obscene materials must be carefully limited.* See *Interstate Circuit, Inc. v. Dallas,* supra, 390 U.S. at 682–685, 88 S.Ct. [1298], at 1302–1305. As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed. * * * A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

"The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, *Kois v. Wisconsin,* supra, 408 U.S. at 230, 92 S.Ct. at 2245, quoting *Roth v. United States,* supra, 354 U.S. at 489, 77 S.Ct. [1304] at 1311; (b) *whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law*; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. We do not adopt as a constitutional standard the 'utterly without redeeming social value' test of *Memoirs v. Massachusetts,* 383 U.S. at 419, 86 S.Ct. [975], at 977 [16 L.Ed.2d 1]; that concept has never commanded the adherence of more than three Justices at one time. * * * See supra, at 2613. *If a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary.* See *Kois v. Wisconsin,* supra, 408 U.S. at 232, 92 S.Ct. [2245], at 2247; *Memoirs v. Massachusetts,* supra, 383 U.S. at 459–460, 86 S.Ct. [975], at 998 (Harlan, J., dissenting); *Jacobellis v. Ohio,* 378 U.S., at 204, 84 S.Ct. [1676], at 1686 (Harlan, J., dissenting); *New York Times Co. v. Sullivan,* 376 U.S. 254, 284–285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964); *Roth v. United States,* supra, 354 U.S. at 497–498, 77 S. Ct. [1304], at 1315–1316 (Harlan, J., concurring and dissenting).

"We emphasize that it is not our function to propose regulatory schemes for

the States. That must await their concrete legislative efforts. It is possible, however, to give a few plain examples of what a state statute could define for regulation under part (b) of the standard announced in this opinion, supra:

"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." (Emphasis supplied)

One of the requirements in *Miller* was that the statutes designed to regulate obscene matters can not be overly broad but must be carefully limited by legislative act or judicial construction. The following language in *Pierce* reflects this court's treatment of this requirement:

"In *Miller,* the court attempted to provide 'positive guidance' to other courts dealing with obscenity issues. *The court recognized 'the inherent dangers of undertaking to regulate any form of expression.' Therefore, the court continued, '[s]tate statutes designed to regulate obscene materials must be carefully limited.' The first limitation mentioned by the court was the scope of the statute: '[W]e now confine the permissible scope of such regulation to works which depict or describe sexual conduct.' Furthermore, '[t]hat conduct must be specifically defined by the applicable state law, as written or [as] authoritatively construed.'* Other guidelines are succinctly stated in the following language:

\*   \*   \*   \*   \*   \*

"The first issue this court must deal with is whether the statute [the Alabama 1961 Obscenity Statute] contains the necessary specificity as required by *Miller. The U. S. Supreme Court in Miller invites judicial construction as a method of supplying the required specificity if such is absent from the statute.* \* \* \*

[T]his court now specifically incorporates the *Miller* guidelines or tests heretofore set out into its construction of the word 'obscene' in Section 374(3). Thus the operation of the provisions of Section 374(4) applicable in this case is limited to matter which depicts or describes sexual conduct. The regulated matter is more specifically restricted to (a) 'Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated,' or (b) 'Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.'" (Emphasis supplied)

From *Miller* it was concluded that in the absence of legislative language supplying the necessary limiting specificity, some state statutes could be judicially construed by engrafting to the statute the necessary limiting specificity and thereby pass constitutional muster. In fact, *Miller* seems to invite judicial construction as a method of supplying the required limiting specificity if such language is absent from the statute. While normally the task of providing limiting specificity to a statute is a legislative function, nevertheless, this court engrafted such limiting specificity to the 1961 Obscenity Statute because of the U. S. Supreme Court's invitation to do so.

Now the majority opinion goes beyond statutes designated to control obscenity and attempts to make the Alabama Red Light Abatement Act a weapon against "hardcore pornography." Obviously, the legislature felt that this act was not an obscenity control statute. This act was passed in 1919 and was on the books when the 1961 Obscenity Act was passed. The 1961 Obscenity Act possesses all of the injunctive relief features which the majority opinion would give to this act. See Title 14, §§ 374(5)–(11), Code of Alabama, 1940, as amended (1958 Recompiled—1973 Cumulative Supp.). Further, there is no invitation from the Supreme Court of the United States for judicial construction to supply the necessary limiting specificity to this

**674**

statute. I interpret *Miller* as limiting judicial construction engraftments to statutes designed to specifically control obscenity. The act in question is indeed broad and comprehensive in its scope—much more so than the 1961 Obscenity Statute. In my opinion the majority opinion goes beyond the pale of permissible judicial construction and crosses over into the realm of ex-. clusive legislative drafting by attempting to apply the same reasoning as was applied in *Pierce*.

Another reason why I cannot concur in the treatment given by the majority opinion involves a consideration of the residual effects that will inure to the Alabama Red Light Abatement Act following such judicial engraftments. Before such engraftments the act in question was a broad, comprehensive act, useful to the State in fighting battles against prostitution, assignation and lewdness. If the majority opinion engrafts the requirements of *Miller* to this act then this act will have to be construed in the future in a much more narrow and restricted sense and can only be used as a weapon against prostitution, assignation and hard-core pornography. The former broad protective scope given to "lewdness" is considerably reduced by the majority opinion.

As was previously pointed out, the 1961 Obscenity Act provides within its arsenal injunctive relief from obscene materials. This act can be used to enjoin the showing of obscene motion picture films. There is no real reason to transform the Alabama Red Light Abatement Act into an injunctive relief procedure to combat hard-core pornographic films because such a procedure has been available since 1961.

For the reasons set forth above, I respectfully disagree with certain specified aspects of the majority opinion but feel that the result reached by the majority is correct.

BLOODWORTH and SHORES, JJ., concur.