(No. 66503.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. SEQUOIA BOOKS, INC., *et al.*, Appellees.

*Opinion filed March 22, 1989.*

MORAN, C.J., took no part.
MILLER, J., joined by RYAN, J., dissenting.

Neil F. Hartigan, Attorney General, of Springfield, and Dallas C. Ingemunson, State's Attorney, of Yorkville (Kenneth R. Boyle, William L. Browers and Marshall M. Stevens, of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

J. Steven Beckett and Glenn A. Stanko, of Reno, O'Byrne & Kepley, P.C., of Champaign, for appellee.

JUSTICE CLARK delivered the opinion of the court:

The precise question presented upon this appeal is whether the State may, consistent with the first amendment, enjoin persons who have sold obscene books out of a building from using that building for any purpose during a specified period of time unless they first post a bond forfeitable upon the renewed sale of obscene books from the premises. We answer this question in the negative.

On January 7, 1986, the Kendall County State's Attorney filed a complaint for preliminary and permanent injunctions against the appellees, Sequoia Books, Inc., Bruce Riemenschneider, and Cathy Riemenschneider, under the authority of sections 37—1 and 37—4 of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1985, ch. 38, pars. 37—1, 37—4). After various proceedings, de-

tailed below, the circuit court issued the requested injunctions in written orders, and the defendants appealed. On appeal, the appellate court, in a unanimous decision, held section 37—1 *et seq.* unconstitutional as applied to adult bookstores which sell sexually explicit materials, and reversed the orders. (165 Ill. App. 3d 143.) This appeal followed.

The provision which the appellate court found unconstitutional states in pertinent part that "[a]ny building used in the commission of offenses prohibited by Section[ ] *** 11—20 *** of the 'Criminal Code of 1961' *** or used in the commission of any inchoate offense relative to any of the aforesaid principal offenses is a public nuisance." (Ill. Rev. Stat. 1985, ch. 38, par. 37—1.) Section 11—20 of the Criminal Code defines the offense of obscenity, a Class A misdemeanor. (Ill. Rev. Stat. 1985, ch. 38, par. 11—20.) Knowing maintenance of a public nuisance is also a Class A misdemeanor. (Ill. Rev. Stat. 1985, ch. 38, par. 37—1(b).) Under a subsequent provision,

> "The Attorney General of this State or the State's Attorney of the county wherein the nuisance exists may commence an action to abate a public nuisance as described in Section 37—1 of this Act, in the name of the People of the State of Illinois, in the circuit court. Upon being satisfied by affidavits or other sworn evidence that an alleged public nuisance exists, the court may without notice or bond enter a temporary restraining order or preliminary injunction to enjoin any defendant from maintaining such nuisance and may enter an order restraining any defendant from removing or interfering with all property used in connection with the public nuisance. *If during the proceedings and hearings upon the merits *** the existence of the nuisance is established,* and it is found that such nuisance was maintained with the intentional, knowing, reckless, or negligent permission of the owner or agent of the owner managing the building,

*the court shall enter an order restraining all persons from maintaining or permitting such nuisance and from using the building for a period of one year thereafter,* except that an owner, lessee or other occupant thereof may use such place if the owner shall give bond with sufficient security or surety approved by the court, in an amount between $1,000 and $5,000 inclusive, payable to the People of the State of Illinois, and including a condition that no offense specified in Section 37—1 of this Act shall be committed at, in or upon the property described and a condition that the principal obligor and surety assume responsibility for any fine, costs or damages resulting from such an offense thereafter." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 38, par. 37—4.

The facts adduced at the hearings below, which are essentially undisputed, are as follows. Since 1982 the Riemenschneiders have owned the building which houses the Denmark II Bookstore, located on U.S. Route 30 in Kendall County. The Riemenschneiders lease the building to Sequoia Books, which operates the store. The store sells sexually explicit magazines.

From 1982 to 1985, 40 criminal cases were filed by the Kendall County State's Attorney against Sequoia or its employees, charging violation of the obscenity statute with respect to approximately 1,500 magazines. Twenty-six of the 40 cases were dismissed by agreement, based on a policy of the State's Attorney to not prosecute clerks who left the employment of the store. Three cases against clerks resulted in directed verdicts in the defendants' favor because of lack of proof on the issue of *scienter*. Three other cases resulted in jury verdicts of not guilty in favor of two defendants who were clerks, and one jury verdict of not guilty in favor of defendant Sequoia. Two hundred thirty-three magazines had been charged in these cases. One jury verdict of guilty was returned against a defendant-clerk, and seven jury verdicts of guilty were returned against Sequoia. In the eight

cases in which guilty verdicts were returned, 165 magazines were determined by the juries to be obscene, 40 magazines were determined to be not obscene, and no jury determination was obtained as to an additional 255 magazines because they were withdrawn from consideration by the filing of amended charges.

In 1986, the Kendall County State's Attorney commenced four more criminal actions against Sequoia and secured jury verdicts of guilty in each of these cases. Those verdicts included findings that 558 magazines were obscene and 13 magazines were not obscene.

On January 7, 1986, the State's Attorney filed a complaint for an injunction under sections 37—1 and 37—4 of the Code. The complaint asserted, in essence, the facts stated above, further contending that Sequoia and its employees continued to sell materials, including magazines, despite their criminal convictions for obscenity and jury determinations that the magazines sold at the store were obscene. Accordingly, the State asked that the property be declared a public nuisance and that the trial court issue preliminary and permanent injunctions closing the building.

Sequoia responded with a motion to dismiss, asserting that the statute, as applied to sexually explicit materials, was invalid on its face because it permitted the imposition of an invalid prior restraint, and because it did not contain the procedural safeguards a valid system of prior restraint requires. At an initial hearing on the complaint, the trial court denied the motion to dismiss and indicated its belief that the Code was constitutional.

An initial hearing was held on February 19, 1986. The facts alleged above were introduced into evidence. On March 14, 1986, the trial court issued a preliminary injunction against Sequoia. The injunction stated in part:

"[T]his Court hereby enjoins the defendant, Sequoia Books, Inc., its agents, employees, and assigns from

maintaining the public nuisance *** and further expressly enjoins the defendant, Sequoia Books, Inc., its agents employees and assigns from exhibiting, selling, or offering for sale materials in violation of Chapter 38, Section 11—20 Illinois Revised Statutes."

On May 1, 1986, the appellate court dismissed an attempted interlocutory appeal of this order as being improperly perfected.

On July 25, 1986, the State's Attorney filed a petition for rule to show cause against Sequoia alleging that Sequoia had violated the preliminary injunction by selling and offering to sell obscene magazines on two specified dates. On August 29, 1986, Sequoia filed written objections in response, contending that the preliminary injunction was unconstitutional and that the procedure being utilized imposed an invalid prior restraint. On that same date, another hearing was held, this time to consider the State's request for a permanent injunction.

On January 7, 1987, the trial court orally pronounced its ruling that it would grant injunctive relief and order the building closed, but would stay the closure on the posting of a bond:

"I think that the injunction would be that they are enjoined from selling obscene magazines on the premises and that the premises should be closed for six months unless Sequoia or—and Riemenschneider give a bond that obscene magazines are not going to be sold from the premises and if they are, then they will—then judgment will be entered against them for that amount."

On January 21, 1987, the trial court entered a written order which enjoined Sequoia from maintaining a public nuisance in the Denmark II Bookstore location and expressly enjoined the exhibition, offer, or sale of obscene materials from the premises. The written order also enjoined both Sequoia and the Riemenschneiders from using the business premises for one year, provided

upon posting a bond in the amount of $5,000 and further conditioned upon no further commission of the offenses specified in section 37—1 of the Code, the building could be used.

Also on January 21, 1987, the trial court found that Sequoia had violated the preliminary injunction order of March 14, 1986, by selling and offering to sell obscene magazines on May 9 and on May 29, 1986. Finding Sequoia in contempt, the trial court imposed a fine of $500.

Sequoia posted the $5,000 bond as required by the January 21, 1987, order. While Sequoia appealed the permanent injunction, the State moved to revoke the bond and vacate any stay of enforcement of the trial court's January 21, 1987, order. The appellate court remanded for a factual hearing, which was conducted in the trial court on April 29, 1987. On May 4, 1987, the trial court entered an order finding that Sequoia had violated the conditions of the bond by selling obscene magazines on March 4 and March 5. On May 11, 1987, over the objections of Sequoia, the appellate court entered an order revoking the appeal bond and dissolving the stay of the injunctive order. On May 29, 1987, this court denied Sequoia's request for a supervisory order to impose a stay.

The appellate court reversed, holding that "the order which enjoins the defendant from selling or exhibiting explicit material at the Denmark II Bookstore for one year acts as a prior restraint on its first amendment rights." (165 Ill. App. 3d at 149.) The court also stated that the *ex parte* temporary restraining order and preliminary injunction provisions of section 37—4 authorized prior restraints, and went on to hold that "the procedural elements of section 37—4 of the Code are constitutionally deficient in safeguarding presumptively protected speech," and that, therefore, the "Code (Ill. Rev. Stat. 1985, ch. 38, par. 37—1 *et seq.*) is unconstitutional

in its application to adult bookstores that sell sexually explicit materials." (165 Ill. App. 3d at 152-53.) Finally, the court concluded that "we reverse the injunctive orders issued by the circuit court of Kendall County." 165 Ill. App. 3d at 153.

For reasons which shall be clear at the end of this opinion, we will concentrate our discussion first on the bond and one-year closure provisions of section 37—4, and the constitutionality of the circuit court's orders under those provisions.

In order to decide the merits of appellees' challenge to the statute, we must first determine the appropriate standard of review. Citing the United States Supreme Court case of *Vance v. Universal Amusements* (1980), 445 U.S. 308, 63 L. Ed. 2d 413, 100 S. Ct. 1156, appellees argue that the trial court's final injunctive order is a "prior restraint," which, under the first amendment, is presumptively invalid and subject to the strictest scrutiny. This was also the reasoning of the appellate court. Citing *Arcara v. Cloud Books, Inc.* (1986), 478 U.S. 697, 92 L. Ed. 2d 568, 106 S. Ct. 3172, the State argues that the injunctive order was not an impermissible prior restraint, and that its impact upon protected conduct is instead to be analyzed under the middle-level standard of review prescribed by *United States v. O'Brien* (1968), 391 U.S. 367, 20 L. Ed. 2d 672, 88 S. Ct. 1673, for State regulation of expressive activities combining elements both of protected "speech" and of unprotected "conduct." The State also argues that the facts of *Arcara* are indistinguishable from the facts presented here, and that the case is, therefore, determinative.

Because of our ultimate resolution of this case, we find it unnecessary to decide whether the challenged statute does in fact authorize a prior restraint. This is a vexing question. Similar closure and padlocking provisions have generally been held invalid as prior restraints

(*Spokane Arcades v. Brockett* (9th Cir. 1980), 631 F.2d 135, *aff'd without opinion* (1981), 454 U.S. 1022, 70 L. Ed. 2d 468, 102 S. Ct. 557; *Pollitt v. Connick* (E.D. La. 1984), 596 F. Supp. 261; *General Corp. v. State ex rel. Sweeton* (1975), 294 Ala. 657, 320 So. 2d 668; *People ex rel. Busch v. Projection Room Theatre* (1976), 17 Cal. 3d 42, 130 Cal. Rptr. 328, 550 P.2d 600; *Mitchem v. State ex rel. Schaub* (Fla. 1971), 250 So. 2d 883; *Sanders v. State* (1974), 231 Ga. 608, 203 S.E.2d 153; *State v. A Motion Picture Entitled "The Bet"* (1976), 219 Kan. 64, 547 P.2d 760; *Parish of Jefferson v. Bayou Landing Ltd.* (La. 1977), 350 So. 2d 158; *City of Minot v. Central Avenue News, Inc.* (N.D. 1981), 308 N.W.2d 851; *State ex rel. Field v. Hess* (Okla. 1975), 540 P.2d 1165; *Commonwealth ex rel. Davis v. Van Emberg* (Pa. 1975), 347 A.2d 712), although they have also, on occasion, been upheld (*State ex rel. Kidwell v. United States Marketing, Inc.* (1981), 102 Idaho 451, 631 P.2d 622; *State ex rel. Cahalan v. Diversified Theatrical Corps.* (1975), 59 Mich. App. 223, 229 N.W.2d 389, *rev'd on other grounds* (1976), 396 Mich. 244, 240 N.W.2d 460).

If we were to consider the challenged orders as prior restraints, they would be subject to the strictest scrutiny. As a general rule, prior restraints are presumptively invalid. (*Organization for a Better Austin v. Keefe* (1971), 402 U.S. 415, 419, 29 L. Ed. 2d 1, 5, 91 S. Ct. 1575, 1578.) In order to pass constitutional muster the restraint must either contain certain specified procedural safeguards (see *Fort Wayne Books, Inc. v. Indiana* (1989), 489 U.S. ___, 103 L. Ed. 2d 34, 109 S. Ct. 916; *Freedman v. Maryland* (1965), 380 U.S. 51, 13 L. Ed. 2d 649, 85 S. Ct. 734), not present here, or must fall within one of several narrowly defined exceptions to the doctrine (see *Southeastern Promotions, Ltd. v. Conrad* (1975), 420 U.S. 546, 555, 43 L. Ed. 2d 448, 457, 95 S. Ct. 1239, 1245).

Whereas prior restraints upon speech are thus strongly disfavored, the State enjoys considerably more leeway where the challenged restriction regulates both " 'speech' and 'nonspeech' elements *** combined in the same course of conduct." In such a case, State regulation is sufficiently justified if "it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." (*O'Brien*, 391 U.S. at 376-77, 20 L. Ed. 2d at 679-80, 88 S. Ct. at 1678-79.) The State argues, and we agree, that the challenged restriction does indeed regulate elements of both speech and nonspeech combined in the same course of conduct.

The activity regulated is the sale and distribution of sexually explicit material, written and visual, from a single location and by a single seller. Insofar as the material is legally obscene, it forms no part of the "speech" protected by the first amendment. Insofar as the material is not obscene, it is speech, and remains fully clothed with first amendment guarantees. The regulation at issue impacts upon both: it increases the economic risks incurred by a person who sells material which falls both adjacent to and within the boundary of the legally obscene.

While we are therefore in agreement with the State that the *O'Brien* test applies to this statute, we do not also agree with its contention that *Arcara v. Cloud Books, Inc.* (1986), 478 U.S. 697, 92 L. Ed. 2d 568, 106 S. Ct. 3172, is determinative. The reason is simple: *Arcara* did not apply the *O'Brien* test, or, for that matter, any other first amendment standard.

In *Arcara*, a New York statute authorized the closure for one year of any building in which any " 'lewdness, assignation, or prostitution is conducted, permitted, or carried on, continued, or exists.' " (478 U.S. at 699, 92 L. Ed. 2d at 573, 106 S. Ct. at 3174.) The respondents owned and operated an "adult" bookstore, on the premises of which they permitted patrons to engage in various sexual acts, including masturbation, fondling, fellatio, and solicitation of prostitution. On the basis of these activities, the district attorney filed a civil complaint against the respondents, seeking a one-year closure order. The New York Court of Appeals reversed the denial of respondents' motion for summary judgment, analogizing the order to a prior restraint and applying the *O'Brien* test. The court of appeals determined that the closure remedy fell within the constitutional power of the State, furthered a substantial interest in thwarting prostitution, and served a purpose unrelated to the suppression of speech. The court of appeals concluded, however, that the closure order swept more broadly than was necessary to achieve the State interest in restriction of illicit commercial sexual activity on the premises.

On writ of *certiorari* the United States Supreme Court reversed, precisely because a majority of the Court believed that the *O'Brien* test did not apply. The Court held that the *O'Brien* test applies only where the activity regulated possessed some "significant expressive element that drew the legal remedy in the first place," or where "a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity." (*Arcara*, 478 U.S. at 706-07, 92 L. Ed. 2d at 578, 106 S. Ct. at 3178.) Since the sexual conduct regulated in *Arcara* contained "absolutely no element of protected expression" (478 U.S. at 705, 92 L. Ed. 2d at 577, 106 S. Ct. at 3177) and had "nothing to do with books or other expressive activity" (478 U.S. at

707, 92 L. Ed. 2d at 578, 106 S. Ct. at 3178), the happenstance that it occurred in a bookstore did not confer any first amendment protection on the bookstore owner. As the Court put it:

"[N]either the press nor booksellers may claim special protection from governmental regulations of general applicability simply by virtue of their First Amendment protected activities. If the city imposed closure penalties for demonstrated Fire Code violations or health hazards from inadequate sewage treatment, the First Amendment would not aid the owner of premises who had knowingly allowed such violations to persist." (478 U.S. at 705, 92 L. Ed. 2d at 577, 106 S. Ct. at 3177.)

Or as Justice O'Connor, concurring, put it: "Any other conclusion would lead to the absurd result that any government action that had some conceivable speech-inhibiting consequences, such as the arrest of a newscaster for a traffic violation, would require analysis under the First Amendment." 478 U.S. at 708, 92 L. Ed. 2d at 578-79, 106 S. Ct. at 3178 (O'Connor, J., concurring).

The State argues that the sale of obscene material is the equivalent of the sexual conduct involved in *Arcara*. If the State were correct, our analysis would be at an end, because the absence of even a minimal first amendment interest would rob the appellees' challenge to the statute of any merit whatsoever. But we do not agree that the sale of obscene material and actual sexual conduct can be so easily equated.

Obscenity is not protected by the first amendment, because an obscene work, by definition: (1) "appeal[s] to the prurient interest," (2) "describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law" and (3) "lacks serious literary, artistic, political, or scientific value." (*Miller v. California* (1973), 413 U.S. 15, 24, 37 L. Ed. 2d 419, 431, 93 S. Ct. 2607, 2615.) Because "the protection given speech and

press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," the first amendment can confer no protection upon works which are "utterly without redeeming social importance" (*Roth v. United States* (1957), 354 U.S. 476, 484-85, 1 L. Ed. 2d 1498, 1506-07, 77 S. Ct. 1304, 1309), and which form "no essential part of any exposition of ideas" (*Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 572, 86 L. Ed. 1031, 1035, 62 S. Ct. 766, 769). Putting the point in another way, we have no reason to think our political, social, or cultural life will suffer in the absence of material which does nothing more than exploit, for commercial ends, patently offensive depictions of sex.

On the other hand, sexually explicit materials, even those ultimately adjudged to be obscene, share with protected speech certain characteristics which are not shared by noncommunicative activity, and which may justify closer scrutiny of governmental regulation which affects them. Sexually explicit materials, like the speech which is fully protected by the first amendment, are composed of symbols—words and pictures—which usually serve to communicate ideas, however worthless these ideas may be. Illusion and reality are not the same thing. Although certain commentators have compared obscenity to sexual conduct because, arguably, obscene materials are designed to produce palpable physiological effects (see Schauer, *Speech and "Speech"—Obscenity and "Obscenity": An Exercise in the Interpretation of Constitutional Language*, 67 Geo. L.J. 899, 922-23 (1979)), the bright line between sex and depiction of sex remains. More importantly, the boundary between obscene "nonspeech" and speech is shadowy compared to the line which normally separates protected speech from unprotected conduct. For these reasons, the United States Supreme Court has acknowledged "the inherent dangers of

undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited." *Miller*, 413 U.S. at 23-24, 37 L. Ed. 2d at 430, 93 S. Ct. at 2614.

Our conclusion that the predicate conduct in this case is to be treated differently than the predicate conduct in *Arcara* is reinforced by the language of *Arcara* itself. It would be difficult to conclude that the sale of obscene books has "nothing to do with books or other expressive activity," and "bears absolutely no connection to any expressive activity." (*Arcara*, 478 U.S. at 707 n.3, 92 L. Ed. 2d at 578 n.3, 106 S. Ct. at 3177 n.3.) Indeed it is an activity at least as closely connected to the first amendment as draft-card burning (*O'Brien*, 391 U.S. at 376, 20 L. Ed. 2d at 679, 88 S. Ct. at 1678), symbolic sleeping and camping (*Clark v. Community for Creative Non-Violence* (1984), 468 U.S. 288, 82 L. Ed. 2d 221, 104 S. Ct. 3065), littering (*Schneider v. State* (1939), 308 U.S. 147, 161, 84 L. Ed. 155, 164-65, 60 S. Ct 146, 150-51), trespassing (*Marsh v. Alabama* (1946), 326 U.S. 501, 90 L. Ed. 2d 265, 66 S. Ct. 276), or making noise (*Grayned v. City of Rockford* (1972), 408 U.S. 104, 33 L. Ed. 2d 222, 92 S. Ct. 2294), all of which have been afforded some degree of first amendment protection when they were "intimately related to expressive conduct protected under the First Amendment" (*Arcara*, 478 U.S. at 706-07 n.3, 92 L. Ed. 2d at 578 n.3, 106 S. Ct. at 3177 n.3). Since sellers of obscene materials are often, as in this case, also sellers of protected speech, regulations which affect them must be carefully scrutinized in order that the proscription of the obscene' does not unduly affect the distribution of protected expression. Similar concerns would be raised by a statute which closed an entire newspaper on the basis of individual instances of unprotected libelous falsehoods which had appeared within its pages.

The same point was made by Justice O'Connor in concurrence to *Arcara* when she stated:

> "If *** a city were to use a nuisance statute as a pretext for closing down a bookstore because it sold indecent books or because of the perceived secondary effects of having a purveyor of such books in the neighborhood, the case would clearly implicate First Amendment concerns and require analysis under the appropriate First Amendment standard of review." *Arcara*, 478 U.S. at 708, 92 L. Ed. 2d at 579, 106 S. Ct. at 3178 (O'Connor, J., concurring).

While Justice O'Connor was referring to the possibility of selective prosecution under a nuisance statute which penalized activity unrelated to speech, the same concern applies *a fortiori* to a nuisance statute which is specifically directed at expressive activity. And while the State argues that this statement only refers to nuisance abatements directed at sellers of material which is "indecent"—a category broader than the legally obscene—we cannot agree that restrictions upon expressive activity, even upon unprotected expressive activity, are completely immune from first amendment review.

We thus come to the application of the *O'Brien* test to the challenged restriction. The State argues that the first two prongs of the test have been met because the "power to abate nuisances" falls within the State's police power and because "preventing the commission of crime is an important government interest." We agree that these two prongs have been met, but not for the reasons advanced by the State. The question presented is not the constitutionality of the nuisance abatement statute in general, but its constitutionality as applied in order to penalize or prevent the use of real property to purvey obscenity. We find that the authority exercised is within the police power of the State, and that the State's

interest in suppressing the use of property to purvey obscenity is substantial.

There is no question that "adult" bookstores and theaters which disseminate obscenity can be controlled under the "State's broad power to regulate commerce and protect the public environment." (*Paris Adult Theatre I v. Slaton* (1973), 413 U.S. 49, 68-69, 37 L. Ed. 2d 446, 463-64, 93 S. Ct. 2628, 2641.) The nature and strength of the State interests in the exercise of that power have, however, rarely been canvassed, precisely because obscenity has been treated as "nonspeech" for whose proscription the State need not advance any rationale at all. (G. Gunther, Cases and Materials on Constitutional Law 1344 (10th ed. 1980).) However, it has been stated, and we agree, that the legitimate State interests at stake include "the quality of life and the total community environment, the tone of commerce in the great city centers, and, possibly, the public safety itself." (*Paris Adult Theatre I*, 413 U.S. at 58, 37 L. Ed. 2d at 457, 93 S. Ct. at 2635.) Common experience, and common sense, suggest that "a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality, can be debased and distorted by crass commercial exploitation of sex." (413 U.S. at 63, 37 L. Ed. 2d at 460, 93 S. Ct. at 2638.) There is also some evidence that obscenity may lead to antisocial behavior, and, in particular, to violence against women. (See, *e.g.*, van den Haag, *Is Pornography a Cause of Crime?* in The Case Against Pornography 162-64 (D. Holbrook ed. 1973); Morgan, *Theory and Practice: Pornography and Rape* in Take Back the Night: Women on Pornography 139-40 (L. Lederer ed. 1980).) More pertinently for the regulation asserted here, the sale of obscenity by "adult" theatres and bookstores, particularly when several of these establishments are concentrated in one neighborhood, "tends to attract an

undesirable quantity and quality of transients, adversely affects property values, causes an increase in crime, especially prostitution, and encourages residents and businesses to move elsewhere." *Young v. American Mini Theatres, Inc.* (1976), 427 U.S. 50, 55, 49 L. Ed. 2d 310, 317, 96 S. Ct. 2440, 2445.

We think that it can be taken for granted that these interests are important and substantial. Since, by definition, obscenity is not protected speech, it may also be conceded that the State's interest in the suppression of obscenity, either in general or at particular locations, is an interest unrelated to the suppression of speech. We do not agree, however, that the incidental restriction on protected speech resulting from this statute is no greater than is essential to the furtherance of that interest.

Insofar as the remedy of nuisance abatement is intended as simply another weapon in the State's antiobscenity arsenal, it is too blunt an instrument. Under the ordinary penal law relating to obscenity, punishment is fairly well calibrated to the nature and gravity of the crime. Each discrete act of selling obscene material is subject to penal sanction. Someone who sells 100 obscene books is, theoretically at least, subject to more severe punishment than someone who sells only a single volume. Under the nuisance statute, on the other hand, the owner of property from which a single obscene work is sold stands in the same danger of losing, for one year, the entire value of his investment, as does the owner of a property from which are sold obscene works in the hundreds or thousands.

This blunderbuss approach to the regulation of obscenity is inconsistent with our traditional insistence that the regulation of any form of expression, even of obscenity, be carefully drawn so as not to impact unduly upon protected speech. It is comparable to the antiobscenity

provisions struck down in *J-R Distributors, Inc. v. Eikenberry* (9th Cir. 1984), 725 F.2d 482, which provided for unlimited civil fines based on the total profits of an establishment deemed a moral nuisance for sale of obscenity, no matter whether these profits were derived from the sale of obscenity or of protected speech. As in that case, the statute at issue here has "the effect of preventing the dissemination of protected speech simply because obscene speech originated from the same location." (725 F.2d at 495.) Moreover, obscenity, unlike the other criminal acts which may trigger a nuisance abatement, is unique—because it is so closely related to, and so hard to distinguish from, protected speech. For this reason, nuisance abatements tend to single out owners of bookstores for harsher treatment than the owners of other kinds of commercial property, and may also be unconstitutional on that ground as well. See *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue* (1983), 460 U.S. 575, 75 L. Ed. 2d 295, 103 S. Ct. 1365.

The State argues that the effect of the abatement is not, after all, very great, since the bookstore owner is free to continue selling books at any other location. If this were really true, it would undercut the State's claim that the statute is needed to serve the State's general interest in suppressing obscenity. If the State were right, the statute will only move the dissemination of obscenity from one place to another, and would not reduce the volume of obscenity ultimately reaching the consumer. In fact, of course, the statute will be effective only if it deters the initial dissemination of obscenity by subjecting bookstore owners to a greater economic risk then they already face under the penal law. But the State has not even argued, much less demonstrated, why penalties imposed upon the individual sales of specific obscene

works, or increases in those penalties, are not a sufficient general deterrent.

Moreover, to the extent that the State is right, and the statute will be an additional deterrent, it will only be effective insofar as it dissuades booksellers from distributing material which falls even arguably close to the shadowy area separating protected speech from unprotected obscenity. Booksellers already pay a price for the distribution of any particular obscene work. Subjecting them to an additional penalty, whose magnitude will vary only with the value of their investment in their premises, would only make sense if the goal were to prevent the dissemination of all sexually explicit material from a particular location, whether or not it was protected. We do not believe that the State's laudable goal of deterring the dissemination of obscenity justifies this kind of overkill.

Similarly, the statute cannot be justified on the grounds of special deterrence: as a means of preventing convicted sellers of obscenity from purveying more of the same in the future. Again, the State has not argued, much less demonstrated, that the usual criminal penalties are not sufficient to achieve this end. The statute only adds to the effectiveness of the penalties already on the books insofar as it prevents a convicted seller of obscenity from selling any books at all, at least for the specified period. Aborting the dissemination of protected speech so as to prevent the possible dissemination of unprotected expression smacks of a prior restraint. In any case, the incidental burden on protected speech is far greater than is necessary to achieve the State's substantial interest in suppressing obscenity.

Lastly, we consider the State's interest in controlling the environmental or secondary effects of the sale of obscenity. This interest may be what the State is talking about when it says that "the property focus of the in-

stant legislation is what distinguishes this case from those which involve the licensing or banning of the communicative activity itself." However, the State has at its disposal far less draconian, and far more narrowly focused, means of combatting pornography's environmental effects. Zoning restrictions, which may either disperse sale of sexually explicit materials to widely separated locations (*Young v. American Mini Theatres, Inc.* (1976), 427 U.S. 50, 49 L. Ed. 2d 310, 96 S. Ct. 2440), or confine it to a relatively small, nonresidential zone (*County of Cook v. Renaissance Arcade & Bookstore* (1988), 122 Ill. 2d 123), have been repeatedly upheld. The State can also abate as nuisances establishments which tolerate or promote sexual and other crimes on their premises. (*Arcara v. Cloud Books, Inc.* (1986), 478 U.S. 697, 92 L. Ed. 2d 568, 106 S. Ct. 3172.) Given the existence of these alternatives, the State has no need to combat obscenity's environmental effects by abating, as nuisances, particular properties upon which obscene works have been sold.

We come to the scope of our holding. The appellate court declared sections 37—1 and 37—4 unconstitutional insofar as they "applied to adult bookstores that sell sexually explicit materials." We frame our holding somewhat differently. Section 37—1 itself merely states that a building used in the commission of, among other offenses, obscenity (Ill. Rev. Stat. 1985, ch. 38, par. 11—20) is to be considered a public nuisance, and that a person who knowingly maintains such a nuisance commits a Class A misdemeanor (Ill. Rev. Stat. 1985, ch. 38, par. 37—1(b)). The penal provision of this section is not properly before us, for the simple reason that appellee has not been convicted under this provision. Therefore, we need not reach the question of whether section 37—1 is constitutional as applied to obscenity. The one-year closure and bond provisions of section 37—4, which were

applied in this case, are declared unconstitutional as applied to properties which have been adjudicated to be nuisances solely on account of their use in the commission of the offense of obscenity under section 11—20 of the Criminal Code of 1961. We express no opinion, however, as to the constitutionality of section 37—4 as applied to the predicate offenses of child pornography (Ill. Rev. Stat. 1985, ch. 38, par. 11—20.1), distribution of harmful material to minors (Ill. Rev. Stat. 1985, ch. 38, par. 11—21) or tie-in sales of obscene publications to distributors (Ill. Rev. Stat. 1985, ch. 38, par. 11—22), none of which were invoked as predicate offenses in this case.

It only remains to consider the *ex parte* preliminary injunction and temporary restraining order provisions of section 37—4. The appellate court discussed these provisions briefly, and seemingly held them also unconstitutional as prior restraints, although that is not entirely clear from the opinion. We note that the United States District Court for the Central District of Illinois has held in an unpublished order that the preliminary injunction provisions of the statute are unconstitutional, but the one-year closure provisions are constitutional. (*Eagle Books, Inc. v. Difanis* (C.D. Ill. March 11, 1987), No. 86—2006.) This decision is currently on appeal before the United States Court of Appeals for the Seventh Circuit. We believe that we need not consider whether the *ex parte* provisions, standing alone, would pass constitutional muster. As a general rule, the invalidation of one portion of a statute on constitutional grounds will invalidate the remaining portion, unless the portion that remains is "complete and capable of being executed wholly independently of that which is rejected." (*County of Cook v. Renaissance Arcade & Bookstore* (1988), 122 Ill. 2d 123, 152; accord *George D. Hardin, Inc. v. Village of Mount Prospect* (1983), 99 Ill. 2d 96, 101-02.) Here, with the bond and closure provisions held unconstitutional as

to obscene material, the *ex parte* provisions which remain are pointless, since they are only intended to preserve the status quo pending a final adjudication that the property constitutes a nuisance. We therefore hold that the *ex parte* provisions of section 37—4 are unconstitutional as applied to properties which are claimed to be nuisances solely on account of their use in the commission of the offense of obscenity under section 11—20 of the Criminal Code of 1961.

For the foregoing reasons, the orders of the circuit court of Kendall County are reversed, and the judgment of the appellate court is affirmed as modified to hold that section 37—4 of the Criminal Code of 1961 is unconstitutional as applied to properties which have been adjudicated, or are asserted, to be nuisances solely on account of their use in the commission of the offense of obscenity under section 11—20 of the Criminal Code of 1961.

> *Judgment of the appellate*
> *court affirmed as modified;*
> *judgment of the circuit*
> *court reversed.*

CHIEF JUSTICE MORAN took no part in the consideration or decision of this case.

JUSTICE MILLER, dissenting:

I do not agree with the majority's conclusion that the closure and release provisions of the nuisance abatement scheme contained in section 37—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 37—4) violate the defendants' constitutional rights of free expression, and therefore I respectfully dissent.

The only challenge raised by the defendants to the closure and release provisions of section 37—4 is that the statute operates as an unconstitutional prior restraint on

free expression, and it was on this ground that the appellate court ruled in the defendants' favor. The majority, however, reaches the same result for a different reason, holding that application of the nuisance statute to the predicate conduct of obscenity violates the test developed in *United States v. O'Brien* (1968), 391 U.S. 367, 20 L. Ed. 2d 672, 88 S. Ct. 1673, for evaluating governmental regulations of symbolic speech. In answer to the argument made by the defendants, I would hold that the closure and release provisions are not, in these circumstances, an invalid prior restraint. In answer to the question discussed by the majority, I would hold that the provisions satisfy the requirements of the *O'Brien* test, assuming that *O'Brien* is applicable here.

Obscenity cannot claim any constitutional protection. *(Miller v. California* (1973), 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607; *Roth v. United States* (1957), 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304.) Because a closure order will prohibit all activity at the subject premises for the duration of the decree unless a bond is posted, the defendants believe that the effect of such a scheme is to improperly restrain, in advance, all expression, including protected speech, at that location. (See *Near v. Minnesota ex rel. Olson* (1931), 283 U.S. 697, 75 L. Ed. 1357, 51 S. Ct. 625.) Courts have been divided on this question. In some jurisdictions, statutes purporting to authorize the closure of adult bookstores and theatres as nuisances based on the past dissemination of obscene material have been struck down as invalid prior restraints. (See *General Corp. v. State ex rel. Sweeton* (1975), 294 Ala. 657, 666, 320 So. 2d 668, 675-76; *People ex rel. Busch v. Projection Room Theater* (1976), 17 Cal. 3d 42, 58, 550 P.2d 600, 609-10, 130 Cal. Rptr. 328, 337-38; *Sanders v. State* (1974), 231 Ga. 608, 614, 203 S.E.2d 153, 157; *State v. A Motion Picture Entitled "The Bet"* (1976), 219 Kan. 64, 73-77, 547 P.2d 760, 769-

71; *Gulf States Theatres of Louisiana, Inc. v. Richardson* (La. 1973), 287 So. 2d 480, 491-92; *City of Minot v. Central Avenue News, Inc.* (N.D. 1981), 308 N.W.2d 851, 871.) Closure statutes have been upheld in other jurisdictions. (See *People ex rel. Kidwell v. U.S. Marketing, Inc.* (1981), 102 Idaho 451, 631 P.2d 622; *State ex rel. Cahalan v. Diversified Theatrical Corp.* (1975), 59 Mich. App. 223, 237-38, 229 N.W.2d 389, 396-97, *rev'd on other grounds* (1976), 396 Mich. 244, 240 N.W.2d 460.) I do not believe that our State's nuisance abatement scheme operates as an invalid prior restraint, and I would sustain the provisions.

Under section 37—4, property constituting a public nuisance may be ordered closed for a period of one year following a judicial determination that a nuisance was maintained on the premises "with the intentional, knowing, reckless or negligent permission of the owner" or his agent. Section 37—1 (Ill. Rev. Stat. 1987, ch. 38, par. 37—1) defines the term "public nuisance" as "[a]ny building used in the commission of" certain enumerated offenses. The offenses that may serve as the predicate conduct for a public nuisance include murder, kidnapping and aggravated kidnapping, keeping a place of prostitution, obscenity, child pornography, possession of explosives or explosive or incendiary devices, and gambling and keeping a gambling place. (See Ill. Rev. Stat. 1987, ch. 38, pars. 9—1, 10—1, 10—2, 11—17, 11—20, 11—20.1, 20—2, 28—1, 28—3.) An owner may gain the release of his property from a closure order by posting "bond with sufficient security or surety approved by the court, in an amount between $1,000 and $5,000 inclusive, *** and including a condition that no offense specified in Section 37—1 of this Act shall be committed at, in or upon the property described and a condition that the principal obligor and surety assume responsibility for any fine, costs or damages resulting from such an of-

fense thereafter." Section 37—4 also authorizes certain *ex parte* proceedings that may result in the issuance of temporary restraining orders and preliminary injunctions against maintaining a public nuisance. I confine my analysis to the closure and release provisions at issue here.

A bookseller convicted of a criminal offense, including obscenity, cannot avoid imprisonment simply by claiming that incarceration will curtail his constitutional rights of free expression. Nor can the owner of a structure that houses a bookstore escape penalties for local building code violations simply by asserting the constitutionally protected status of that business. The closure and release provisions of section 37—4 should be considered in a similar light. If the provisions serve a penal purpose, unrelated to the suppression of protected speech, then I would sustain the measures as a proper exercise of the police power. An examination of the provisions and a comparison of their sanctions with the penalties for related illegal conduct persuade me that the closure and release provisions are valid.

The effects of a closure order are less onerous than the consequences that may result from conviction for either the offense of maintaining a public nuisance or the predicate offense of obscenity. A closure order operates only against the premises where the violations occurred. The lessee and the property owner both remain free to transact their businesses at any other location. Moreover, a party who takes advantage of the release provision of section 37—4 may, by posting a bond in an amount between $1,000 and $5,000, continue operating at the affected location upon the condition that none of the offenses specified in section 37—1 will occur there. The closure and release provisions thus serve to deter the commission of illegal conduct.

Commission of a public nuisance under section 37—1 of the Criminal Code is a Class A misdemeanor; a sec-

ond or subsequent violation is a Class 4 felony. (Ill. Rev. Stat. 1987, ch. 38, par. 37—1(b).) Obscenity, the predicate conduct in this case, is classified similarly: a first offense is a Class A misdemeanor, and a second or subsequent violation is a Class 4 felony. (Ill. Rev. Stat. 1987, ch. 38, par. 11—20(d).) A Class 4 felony is punishable by a term of imprisonment of between one and three years; a Class A misdemeanor is punishable by a sentence of imprisonment of less than one year. (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—8—1(a)(7), 1005—8—3(a)(1).) The maximum fine for a felony is $10,000, and the maximum fine for a Class A misdemeanor is $1,000. (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—9—1(a)(1), (a)(2).) Thus, section 37—4, which authorizes the closure of the premises for a one-year period, is no more severe than the maximum period of incarceration that may be imposed for the misdemeanor offenses of obscenity or maintaining a nuisance. The bond required for release of property from a closure order may be in an amount between $1,000 and $5,000, which lies in the middle of the range of fines that may be imposed against felony violators of the obscenity and nuisance statutes. These similarities between the potential punishment for the predicate conduct and the duration of the closure order and the authorized amounts of the release bond demonstrate that the abatement provisions of section 37—4 serve a penal purpose, which is designed to exercise a deterrent effect on illegal conduct of the nature specified in section 37—1.

Nor can it be argued that the release provision, allowing continued operations at the premises upon the condition that no violation of the offenses enumerated in section 37—1 occur there, including the offense of obscenity, provides an inadequate guide for future conduct. That objection assumes that the definition of obscenity is unconstitutionally vague, which is an entirely separate question, and one that is not raised here. The terms of

the release provision, and indeed of any injunctive measure prohibiting the sale or distribution of obscene materials, are no less clear than the criminal law on which they are based.

The Supreme Court has held that an injunction may issue against the future dissemination of a specific item that has been determined to be obscene. (*Kingsley Books, Inc. v. Brown* (1957), 354 U.S. 436, 1 L. Ed. 2d 1469, 77 S. Ct. 1325.) This court has held that a party may be enjoined from committing unspecified acts of obscenity in the future. (*City of Chicago v. Festival Theatre Corp.* (1982), 91 Ill. 2d 295.) The nuisance abatement scheme of section 37—4 authorizes the temporary forfeiture of the use of premises employed in the commission of certain offenses. An owner may gain release of his property by posting the necessary bond, subject to the condition that further violations of the criminal statutes specified in section 37—1 will not occur during the pendency of the bond. I would conclude that the statutory scheme is not an invalid prior restraint.

Rather than analyze the closure and release provisions of section 37—4 under the prior restraint doctrine, as the defendants urge, the majority relies instead on the four-part test developed in *United States v. O'Brien* (1968), 391 U.S. 367, 20 L. Ed. 2d 672, 88 S. Ct. 1673, a case involving governmental regulation of symbolic speech. Indeed, a number of commentators have suggested use of the *O'Brien* test in cases involving closure, or padlock, orders in anti-obscenity nuisance proceedings. (See Note, *Restraining Prior Restraint, or a Call for Balancing in Evaluating Obscenity Abatement Statutes: City of Paducah v. Investment Entertainment, Inc.*, 82 Nw. U.L. Rev. 181, 202-10 (1987); Note, *Pornography, Padlocks, & Prior Restraints: The Constitutional Limits of the Nuisance Power*, 58 N.Y.U. L. Rev. 1478, 1513-28 (1983).) An early application of *O'Brien* to regu-

lations affecting sexually explicit material came in Justice Powell's concurring opinion in *Young v. American Mini Theaters, Inc.* (1976), 427 U.S. 50, 49 L. Ed. 2d 310, 96 S. Ct. 2440. *Young* involved a Detroit zoning ordinance that contained locational restrictions on certain land uses, including theatres and bookstores exhibiting or selling sexually explicit, though not necessarily obscene, material. The operators of two adult theatres challenged the zoning scheme on a number of constitutional grounds. A majority of the Court ruled that the ordinance was not unconstitutionally vague and did not operate as an invalid prior restraint on protected expression. The Court also rejected the theatre operators' argument that the classification system on which the ordinance was based, with its distinction between businesses that purveyed sexually explicit material and those that did not, was a denial of equal protection. A plurality believed that sexually explicit material warranted less protection than pure political speech and found no reason to upset the scheme. Justice Powell, who supplied the necessary fifth vote for the Court's rejection of the theatre operators' equal protection argument, analyzed the ordinance under *O'Brien* instead. He too concluded that the Detroit zoning ordinance was constitutional.

The fourth part of the *O'Brien* test asks whether "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of [the governmental] interest" (*O'Brien*, 391 U.S. at 377, 20 L. Ed. 2d at 680, 88 S. Ct. at 1679), and the majority concludes that the closure and release provisions at issue in this case unnecessarily interfere with protected expression.

One may question whether the *O'Brien* test is applicable here. *Arcara v. Cloud Books, Inc.* (1986), 478 U.S. 697, 92 L. Ed. 2d 568, 106 S. Ct. 3172, involved the one-year closure of a bookstore, pursuant to a State statute,

where prostitution and other acts of lewdness had occurred. As the majority opinion recounts, the Court ruled that the *O'Brien* test was not applicable in that case. Referring to the decision of the New York Court of Appeals, which had relied on *O'Brien* in striking the closure order, the Supreme Court stated:

"That court ignored a crucial distinction between the circumstances presented in *O'Brien* and the circumstances of this case: unlike the symbolic draft card burning in *O'Brien*, the sexual activity carried on in this case manifests absolutely no element of protected expression. In *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67, 37 L. Ed. 2d 446, 93 S. Ct. 2628 (1973), we underscored the fallacy of seeking to use the First Amendment as a cloak for obviously unlawful public sexual conduct by the diaphanous device of attributing protected expressive attributes to that conduct. First Amendment values may not be invoked by merely linking the words 'sex' and 'books.' " 478 U.S. at 705, 92 L. Ed. 2d at 576-77, 106 S. Ct. at 3176-77.

Here too the conduct that brought on application of the nuisance abatement scheme contained no protected expressive element. Obscenity, whether in conduct, in words, or in pictures, enjoys no constitutional protection; words alone may be legally obscene, and therefore unprotected. (*Kaplan v. California* (1973), 413 U.S. 115, 118-19, 37 L. Ed. 2d 492, 496-97, 93 S. Ct. 2680, 2683-84.) Because the predicate obscenity in this case, like the predicate acts of sexual conduct in *Arcara*, was completely unprotected by the first and fourteenth amendments, I would conclude that *O'Brien*, relied on by the majority, is inapplicable here as well. It may be noted that the zoning ordinance at issue in *Young*, in which Justice Powell invoked *O'Brien* in his concurring opinion, regulated sexually explicit, but not necessarily obscene, material and therefore had an impact on protected expression. And contrary to the majority's view,

the closure and release provisions do not have the effect of singling out for regulation bookstores and other purveyors of protected expression. The nuisance abatement scheme may be triggered by a wide variety of offenses, as enumerated in section 37—1.

Assuming, nevertheless, that application of the *O'Brien* test to this case is appropriate, I do not agree with the majority's holding that the closure and release provisions at issue here fail to satisfy the fourth element of that test. In *Young*, in rejecting the theatre operators' equal protection challenge to the classification scheme created by the zoning ordinance, Justice Stevens stated:

> "[E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate ***. Whether political oratory or philosophical discussion moves us to applaud or to despise what is said, every schoolchild can understand why our duty to defend the right to speak remains the same. But few of us would march our sons and daughters off to war to preserve the citizen's right to see 'Specified Sexual Activities' exhibited in the theaters of our choice." (*Young,* 427 U.S. at 70, 49 L. Ed. 2d at 326, 96 S. Ct. at 2452 (plurality opinion).)

Writing for a plurality, Justice Stevens concluded that the State could classify land uses on the basis of the sexually explicit material disseminated from the affected businesses.

I would assess the effect of the closure and release provisions on the defendants' constitutionally protected activities in a similar light. The defendants here have been convicted of obscenity. The closure provision, which punishes past violations and deters future dissemination of unprotected material, is no more onerous than criminal sanctions of fines or imprisonment would be. It is ap-

plicable only to the premises where the violations took place, and the defendants remain free to transact business in other locations. Moreover, the defendants may gain release of their premises by posting the necessary bond. I would conclude that those aspects of the nuisance abatement scheme are constitutional.

JUSTICE RYAN joins in this dissent.